UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 1:22-cr-00024-AW-GRJ |
| | ) |
| PATRICK PARKER WALSH | ) |
| | ) |
|     Defendant. | ) |

## PATRICK WALSH'S MOTION FOR VARIANCE, MOTION FOR DOWNWARD DEPARTURE, AND MEMORANDUM IN AID OF SENTENCING

Patrick Parker Walsh, having pleaded guilty and accepted responsibility, respectfully, through his counsel, submits this memorandum to provide information to assist the Court with fashioning a sentence that is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment and a just sentence. Mr. Walsh respectfully requests the Court to consider the multiple factors pursuant to 18 U.S.C. §§ 3553(a)(1)-(7) that warrant a variance and a sentence significantly below the advisory guidelines range. Mr. Walsh also respectfully requests the Court grant a motion for a downward departure pursuant to USSG §2B1.1, Application Note 21(C). For the reasons set forth below, Mr. Walsh respectfully requests the Court sentence him to 18 months imprisonment and not order a fine.

1

# I.    INTRODUCTION

Patrick Walsh is a 42-year-old devoted father of 11 children, loving husband, local business owner, and valued member of his church and community. Mr. Walsh has devoted most of his life to serving others through missionary work, charitable organizations, and his church. These are not mere platitudes – Mr. Walsh's dedication to others is demonstrable and longstanding.

He grew up with loving and nurturing parents, yet his childhood was far from conventional. He was the second oldest of 9 children. When he was 5 years old, his parents filled a call to be missionaries and moved the family to Belize. Over the next few years, the family moved throughout South America, wherever the need to help others was greatest. The family was passionate about helping children and they sought missionary trips that would best serve children in need. Throughout Mr. Walsh's youth, the family created self-sustaining food programs to feed the poor. They helped build soy factories in Guatemala and El Salvador to provide a sustainable food source to feed children living in orphanages.  This way of life taught Mr. Walsh the importance of family and forged his innate need to care for, support, and provide for others.

As the family continued to grow, it became difficult to raise 9 children abroad and Mr. Walsh's family returned to the United States and established a home in

Florida near his grandparents. The family continued to feel the call to service of others and they took multiple missionary trips to Africa and Mexico throughout Mr. Walsh's teenage years. When they weren't traveling, the family became active members of the Faith Baptist Church in Williston, Florida and participated in various charitable organizations.

Service to God, family, and community remains the family priority. Mr. Walsh acknowledges that he was raised with a strong moral foundation and the guiding premise of helping and supporting others. His greatest regret is that when he was faced with a difficult situation and his faith was tested, he failed the test. He is deeply remorseful for his bad decisions and the devastating consequences his choices have had, and will continue to have, on his wife, children, family, employees, and community. He stands before the Court as a first-time offender with sincere remorse, embarrassment, and regret for making poor decisions that now overshadow decades of service to others, hard work, and attempts at an exemplary life. Through this submission, Mr. Walsh provides the Court with additional information to consider in formulating a just sentence.

7238802 _1

## II. MOTION FOR A VARIANCE AND ANALYSIS OF STATUTORY FACTORS AS APPLIED TO THIS CASE

### A. Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)

Mr. Walsh admits to falsifying corporate information to obtain both PPP and EIDL loans in excess of what his companies qualified for. It is important for the Court to understand the background and circumstances surrounding Mr. Walsh's poor decisions when formulating a sentence.

The Walsh family's missionary calling led to somewhat of a wandering "gypsy" lifestyle which was not conducive to a traditional education. Mr. Walsh was homeschooled and earned his high school diploma at Williston Christian Academy.

It was during his teenage years, that Mr. Walsh fell in love with aviation. At the age of 16, he attended the International Alert Academy in Watersmeet, Michigan, where he studied aviation and earned his pilot's license in 1998. The Alert Academy provided a forum for Mr. Walsh to combine his passion for aviation with his drive to serve. The program taught students skills to participate on disaster response teams. He experienced numerous deployments throughout south and central America and provided support and relief in the United States in times of crisis. Mr. Walsh is most proud of his search and recovery efforts after the Space Shuttle Columbia crash, where he worked alongside the FBI and NASA to provide valuable and necessary assistance.

7238802 _1

Over the next few years, Mr. Walsh earned multiple aviation licenses and certificates including aircraft maintenance, single and multiple-engine aircraft, private and commercial aircraft, flight instructor, and instrument panel reading. His career path naturally combined his love for flying with his passion to help others. He worked as Chief Pilot for the Center of BioEthical Reform, a company doing missionary student outreach on college campuses.

Mr. Walsh was married at this time to his first love, Hannah, and this job opportunity allowed him to follow his dreams, while providing financial stability to his young wife and first-born son, Patrick Adrian. The young family flew around the United States so Mr. Walsh could pilot planes and supervise other pilots in an airplane banner campaign. The family hoped this would eventually lead to a life of continued missionary work.

In 2007, the Walsh's second son, Brandon, was born with a serious congenital heart defect – the left side of his heart was not fully formed. He miraculously survived an experimental heart surgery and is now 15-years old. Brandon has had three major open-heart surgeries and various smaller surgeries to repair aortic valves and place stents; he remains on the heart transplant list.

Knowing that the missionary lifestyle was not conducive to a young child with significant health issues, Mr. Walsh elected to change his career path. His employer

offered him the opportunity to purchase the company's five planes when funding for the air banner campaign was depleted. Mr. Walsh saw this entrepreneurial opportunity as a chance to continue to do what he loves, while creating a stable and financially sound future for his family. He borrowed money from friends and created AirSign Airship Group in Williston, Florida, in 2008, an aerial advertising company focused on selling airplane banners to local businesses to fly banners over nearby beaches. Mr. Walsh enjoyed success in his local business and decided to expand his client base nationally to incorporate larger corporate clientele. He developed relationships with large advertisers for national campaigns, subcontracting work to local providers and flying his own fleet.

The business unfortunately suffered tragedy in 2010; a pilot flying one of the corporate planes crashed and died on assignment. One week later, another pilot ran out of fuel mid-flight but survived. Business partners pulled out due to the potential liability and advertisers canceled contracts due to negative publicity. Mr. Walsh struggled to meet ends and rebuild the business.

To meet the growing demands of the market, Mr. Walsh secured funding and expanded business services, offering helicopter, skywriting, and digital skywriting. This business strategy paid off and the business continued to flourish, affording Mr. Walsh the opportunity to expand into the blimp business in 2015. The Walsh family

also flourished during this time and the family proudly welcomed 3 daughters and 2 additional sons. Mr. Walsh and his wife Hannah explored real estate investments and began flipping homes as an additional source of income so that Hannah could stay home with the children and provide for their education. One real estate purchase in 2019, included Sweetheart Island for approximately $116,550. This was not the purchase of a tropical paradise for entertainment, but a real estate opportunity where Mr. Walsh hoped to generate new revenue.

Airsign Airships Group continued to enjoy success and garnered national acclaim in 2017, winning a prestigious Telly Award for advertising. This success brought on greater opportunities and a blimp was commissioned by a large bank to advertise over the US Open Golf Tournament in Wisconsin. Tragedy struck once again and the blimp caught on fire, falling to the ground on live television. The pilot amazingly survived but with serious injuries. Clients began pulling out because of the disaster and Mr. Walsh's business faced financial ruin.

Again, Mr. Walsh persevered, learning from prior business failings to refocus business priorities. He sold all his planes so he could purchase almost every other airship company in the country, besides Goodyear. To accomplish this expansion goal, he took on risk and accumulated significant high-interest debt. The company went from a small business with some successes and challenges to a company with

7

fifteen blimps, expanding quickly with a high growth curve. The business grew nationally and internationally over the next several years, and Mr. Walsh created subsidiaries for each new market.

In 2019, the companies had $16 million in blimp sales and expanded into the Latin America and Asian markets. The companies grew to approximately 80 employees, including seasonal and advertising campaign-specific temporary employees and employees for various international projects. The air sign business secured $19 million in sold contracts pending delivery to start January 2020, including Carnival Cruise Lines and several other renowned brands. Mr. Walsh assumed he could easily pay-off the high-interest loans incurred during the expansion with income from these lucrative projects.

**And then the devastating global pandemic hit. Covid-19 did not slow down business, it killed it.** In April 2020, all air ship business operations were terminated. Mr. Walsh's business went from sales of millions per month to almost zero, while expenses and debt remained relatively high and interest on the corporate loans continued to grow exponentially.

When Mr. Walsh realized that Covid was not a short-term problem, he panicked. In 2020, Mr. Walsh and his wife had 10 children and he was the sole financial provider for his family. His son Brandon suffered from critical, ongoing

7238802 _1

health issues and Mr. Walsh needed to maintain his health insurance to be able to afford a life-saving future heart transplant for his son. He employed a large number of employees who relied on their jobs to feed and house their families. This background information is not provided to make excuses for Mr. Walsh's bad decisions, but to provide the Court with the reason those bad decisions were improperly made.

Mr. Walsh succumbed to fear – fear of the fact that he would lose the business he built over the past 18 years, fear that he would not be able to provide for his family, fear that he would jeopardize his son's life, fear that his business decisions in obtaining those high-interest loans would be his personal and professional downfall. For a person who spent his life serving others and being the "hero," these failures were not something he could easily face. Greed did not motivate Mr. Walsh to falsify information for those loans, rather, it was desperation, the pressure of his overwhelming responsibilities, and the fear of failing and letting down those around him that led him to make these extremely poor decisions.

Unlike many of the PPP fraud cases that have been prosecuted nationally, Mr. Walsh had actual, viable businesses with employees. While he took advantage of a program and obtained loan proceeds beyond what his companies qualified for, Mr. Walsh did not use the loan proceeds to go on lavish trips or to buy expensive cars,

boats, or jewelry. Mr. Walsh paid his employees, and he used the majority of the proceeds to keep his businesses afloat and to keep his staff employed. Unfortunately, Mr. Walsh viewed the loans as inexpensive capital to replace his high-interest debt and became aggressive in his loan applications, seeking funds over and above which his companies were entitled. To the obtain the loans, Mr. Walsh made poor choices, including fabricating documents when necessary to obtain the loans.

The blimp business was decimated by Covid and stopped generating any revenue when the pandemic shut down the entertainment industry, and the world, in April 2020. It was unclear when or if the blimp business would return to normalcy. Because of the sudden termination of revenue and the financial uncertainty of when the business would be able to turn a profit, Mr. Walsh used the loan proceeds to pursue other business opportunities, including continuing to purchase and flip real estate through his prior established businesses and venturing into the oil business to replace the revenue lost from the pandemic. The money generated from his other businesses provided a sustainable income for his family and allowed him to maintain some staff.

Mr. Walsh did not apply for forgiveness of loans, and he always intended to pay back the outstanding loans when the pandemic was over, and the entertainment industry returned. Ironically, the PPP and EIDL loans enabled Mr. Walsh to save the

airship companies and retain staff. Business returned slowly as the economy rebounded. The company recently secured a large project, wrapping two airships as sharks to promote the high-profile Shark Week for the Discovery Channel.

Mr. Walsh acknowledges that these recent successes do not absolve his prior mistakes and he deeply regrets falsifying any information on the PPP and EIDL loan applications. He understands and appreciates the gravity of his mistakes and the damage he has done to other viable businesses worthy of SBA disaster funds. He also understands the pain and hardship he has inflicted upon his family, children, and employees. He is currently selling off his business assets to pay restitution to the SBA and begin to make amends.

## B. Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)

Mr. Walsh is a first-time offender and, with the exception of these offenses, has led a truly exemplary life. He adores his wife and is a supportive and loving spouse. He is an amazing father to his 11 children and is always active and present in their lives. They are an extremely close family; his children are home-schooled and they live on a farm where they have horses, chickens, and cows. Patrick and Hannah believe that these surroundings help the children not only to appreciate each other, but to appreciate nature and its blessings. Mr. Walsh often arranges his work schedule to attend his kids' activities including, karate, volleyball, horseback riding,

and animal husbandry. He takes his family on extended business trips so that he can provide support to his wife and be continuously present in their lives.

Mr. Walsh has dedicated his life to helping others and serving those less fortunate. He dedicated many years of his life through missionary work, helping to build sustainable food systems for the orphaned children and indigent communities. He hoped to continue this life work as he grew older, however missionary work proves difficult with 11 children, especially with a child who requires specialized healthcare. Over the past several years, Mr. Walsh has focused on community projects and service through his church to fulfill his drive to help others and give back to his community. He has donated a great deal of time to a local association, the Arc of Levy County, that provides assistance to mentally disabled citizens and disabled persons. When Mr. Walsh and his friends recognized that there was a lack of resources in their rural community for the mentally challenged, they helped build a local chapter, the Gulfhammock Wild Hog Canoe Race. They raised tens of thousands of dollars by hosting events, organizing yard sales, and throwing community cookouts over the years to sponsor this nonprofit organization. Keith Maynard, President of the 501(C)(3), praises Mr. Walsh and his dedication to charity in his letter to the Court:

7238802 _1

Patrick is a man with a huge heart!! He has been a blessing to me AND my organization. Patrick and his family have always volunteered to help us put on the Wild Hog Canoe Race and every year for the past 11 years. Always willing to help in any way needed. He has donated his time and money to help make the event a big success, even participating in the race itself with his children. Patrick is a good family man!!

Patrick owns an aerial advertising business and blimp business in Williston, FL. There are 3 warehouses on the property. He has let us one of the warehouses to store donated items and put on yard sales for about 9 years and never once asked for any rent.

Mr. Walsh is steadfast in his faith and attends church multiple times per week with his family. He and his wife encourage their children to give back to the community through volunteer work with Awana, a faith-based organization that focuses on the spiritual devotion of children. For most his life, Mr. Walsh followed the gospel he studied and tried to emulate his life to reflect his deep Christian faith.

As evidenced by the letter from his Pastor, Reverend Kendall, Mr. Walsh sought spiritual guidance early in this investigation and appears to be genuinely repentant. He also commented on Mr. Walsh's compassion and generosity:

Patrick has also demonstrated a generosity to others. He has employed many people who have been in financial need. He has graciously helped them get on their feet and established. I have known him to be a generous man who is concerned about the welfare of others, and I have seen this concern drive him to take action to help."

This sentiment is corroborated by employee Greg Jacobs, who writes:

7238802 _1

As if 11 children weren't too much to watch over, Patrick and Hannah, for that matter, welcome us, as employees into the fold. He has this sense of obligation to each of us to be sure he is taking care of us as well. Whether it is through our payroll or needing time off for personal matters, he is sure to be there for us like he would for his own.

This sense of obligation kept Mr. Walsh on a faithful path for most of his life and it also made him stumble from that path in a time of great distress. He has prayed on this issue and accepted responsibility early during his criminal prosecution to become a better role model for his children and community.

Mr. Walsh's drive to help has been a life-long endeavor; it did not start at the inception of this case, and it will not end after his sentencing. He has been working closely with Prison Professors Charitable Corporation, a charitable organization dedicated to critical prison reform that creates programs to teach and inspire people in prison and at-risk youth valuable life skills. Mr. Walsh created a lesson plan for distribution in jails and prisons across America. Mr. Walsh's lesson plan, *"Teaching People in Prison with Patrick Walsh"* will also be used as a resource for training to help formerly incarcerated people transition into the labor market.

Mr. Walsh attaches and incorporates letters of support as ***Exhibit A.***

**C.    To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).**

Mr. Walsh understands the seriousness of his offenses, but in assessing a "just" punishment, asks the Court to consider that these were non-violent offenses committed by a man with no prior criminal history and the proceeds of his crimes were used largely in support of his businesses, and not to fund a lavish or extravagant lifestyle. Mr. Walsh accepted responsibility early and pled guilty to a pre-indictment plea. He has been cooperative with law enforcement and worked with the government to create a business plan that allows him to pay restitution as soon as possible. Over the past few months, he has been working diligently to pay off his debts and make his victims whole, selling business assets and properties (with DOJ approval) and wiring the proceeds of these sales to government escrow accounts.

To date, Mr. Walsh has made total repayment proceeds in the amount of $1,612,487.04. Mr. Walsh recently submitted an updated plan to the government regarding the sale of additional assets and properties to pay complete restitution payments.

Mr. Walsh has also been working diligently to keep his business afloat and his staff employed. Thomas Oakes, a consultant for Mr. Walsh's airship companies,

also praised Mr. Walsh's hard work and dedication to making his businesses succeed:

> We ancticipate the future growth of the LED Airship to be potentially explosive and want to expand to other markets such as Los Angeles, Las Vegas, and New York to give advertisers the ability to expand their reach…Now to bring this full circle, if it has not been for Patrick's calm demeanor and dedication to achieving great things none of this business could have happened.

The possible loss of his aviation business that he spent the past decade building, the significant amount of money owed in restitution, the pending demand for treble damages via a civil lawsuit by the government, the sale of his assets, and the substantial harm to his reputation are all significant punishments. The harshest punishment, however, is Mr. Walsh knowing the harm and hurt that he has brought to his family who still very much needs him to be present in their lives. No matter his sentence, Mr. Walsh considers himself lucky to have his family's continued love and support.

## D. To afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B).

The prosecution Mr. Walsh brought upon himself has devastated him personally, professionally, and financially. The charges and intense negative media coverage surrounding the case have had a detrimental impact on his family and his business. Mr. Walsh is selling off his personal and business assets to pay restitution

and make his victims whole. He faces losing the aviation business he spent over a decade building. The USAO and DOJ Civil Divisions are conducting civil investigations of Mr. Walsh and his entities for alleged violations of the False Claims Act and, even with a request for a pre-indictment global settlement, are demanding *treble* damages in addition to the restitution and forfeiture in the criminal case. This aggressive dual prosecution will cripple Mr. Walsh and is family for years to come.

Mr. Walsh was always proud of his ability to provide financial and emotional support to family; his ability to provide for his family is now gone and he is struggling to figure out a plan to support his wife and 11 children during any term of incarceration.

A lengthy jail sentence is not called for in this case and would not further the statutory goals of sentencing. As a result of this widely reported case, the public now understands what can happen when the full prosecutorial force of the United States government is brought down upon an individual, and would-be violators have been generally deterred from engaging in similar conduct.

## E. Protecting the public from further crimes. 18 U.S.C. § 3553(a)(2)(C)

Mr. Walsh does not present a risk of recidivism. His age, lack of record, supportive family, employment history, and unwavering faith show there is an extremely low risk that he will recidivate. He took responsibility for submitting false

information to support the applications in a pre-indictment plea and has done everything possible to make reparations prior to his sentencing date.

## F.    Kinds of Sentences Available, 18 U.S.C. § 3553(a)(4)

A period of significant incarceration would not benefit anyone in this case. Mr. Walsh accepted responsibility, has been actively working to pay off restitution, and has been cooperative throughout the prosecutorial process. He has the capability of being released from prison to successfully build his other businesses in the real estate and oil fields, allowing him to create employment opportunities in other rural communities. It would also allow him the ability to financially recover and provide for his wife and 11 children.  An 18-month sentence would allow Mr. Walsh to continue to be a contributing member of society without being a financial burden to an already overly crowded prison system still suffering from the ramifications of COVID-19, of which Mr. Walsh contracted in 2021 and almost died.

## G.    Need to Avoid Unwarranted Sentencing Disparities

We would ask the Court to take into consideration not only the sentences that have been given in PPP cases that have been prosecuted but also the Government's disparate charging decisions.  Here, in addition to pursuing Mr. Walsh criminally, despite his demonstrated commitment to rapidly paying restitution, the government is also pursuing Mr. Walsh civilly and is demanding he pay treble damages in

addition to the restitution and forfeiture to be ordered at his sentencing. While parallel criminal and civil actions are not unusual or inherently unfair, here, the government's insistence is that Mr. Walsh plead guilty, accept responsibility, pay restitution, pay forfeiture, go to jail, and then also pay treble damages. The government has the discretion to proceed how it deems appropriate but the blatant piling-on in this case is disparate from other reported cases in this District and otherwise. The Court should be aware of the government's unique aggressive-stance with respect to Mr. Walsh – the impact of his sentence will likely be more significant than usual as a result.

Certain factors, not present here, lead to lengthier jail sentences. Those factors include lavish spending, boasting about the crime publicly, and lack of remorse/acceptance in procurement of the proceeds. Mr. Walsh, unlike some of the individuals receiving lengthier jail sentencing, and without minimizing what he did do, did not spend lavishly on luxury cars, trips or consumer goods, did not boast about stolen funds and a lavish lifestyle on social media, and did not obstruct the government's investigation. On the other hand:

1. In *United States v. Benjamin Tifekchian*, 3:21-cr-00244-IM, District of Oregon, received a 21 month prison sentence. There, the defendant, who was also wanted for murder in his home country of Armenia, fraudulently

obtained $910,773.35, which he spent on travel and gambling instead of for legitimate purposes.

2. In *United States v. Shahank Rai,* No. 1:21:cr-00009, Eastern District of Texas, the defendant received 24 months imprisonment.  There, the defendant filed 2 PPP loan applications seeking $10 million and $3 million respectively and claimed to have 250 employees earning wages in each application when, in fact, no employees worked for his purported business.

3. In *United States v. Julio Lugo and Rosenide Venant,* No. 8:21-mj-01295, Middle District of Florida, Julio Lugo received 42 months imprisonment. The defendant there submitted at least <u>seventy</u> (70) false and fraudulent loan applications seeking PPP and EIDL funds, including for shell companies established by the defendants and their relatives. The defendant also spent lavishly, including paying off a luxury vehicle, spending more than $62,000 at casinos, and for other personal purposes. Additionally, the conspirators withdrew at least $320,000 in cash. On top of that conduct, Lugo also boasted about the misuse of the SBA funds in a Facebook video featuring a hotel room littered with $100 bills and at least $5,000 in merchandise from Louis Vuitton.

4. In *United States v. David T. Hines*, 1:21-cr-20011, Southern District of Florida, the defendant received 78 months imprisonment. There, the defendant fraudulently obtained approximately $3.9 million, which he spent on a $318,000 Lamborghini Huracan for himself and other personal expenses.

5. In *United States v. Lee E. Price*, III, 4:20-cr-00522, Southern District of Texas, the defendant received 110 months imprisonment. There, the defendant obtained approximately $1.6 million in loans, which he spent on a Lamborghini Urus, a Ford F-350 and a Rolex watch. The defendant also used the identity of another person, identified by the government as Victim 1, a deceased person, to obtain a small business construction PPP loan.

Mr. Walsh's sentence should account for the disparity in the type of criminal behavior he committed, because that conduct, while very serious, was different than other conduct that resulted in the above-described lengthy jail sentences.

## H.    Restitution

Mr. Walsh negotiated and entered into a Plea Agreement Rider to memorialize his agreement and plan to actively and quickly pay restitution to the government. He provided the government with two avenues of repayment: 1) sell his company which would have provided enough money to satisfy his restitution obligation or 2) sell his

airship assets and various properties which would also satisfy his restitution obligation but over a longer period of time. Mr. Walsh had a buyer for his airship business, entered into a sales contract, and had a closing date. Unfortunately, the negative publicity associated with Mr. Walsh's plea of guilty caused the purchaser to back out of the transaction.

Mr. Walsh started actively selling his properties and assets. To date, Mr. Walsh has worked hard to liquidate his assets on a near fire-sale basis and has made total repayment proceeds in the amount $1,612,487.04 to the government thus far. Specifically, he has sold the following assets:

- Sold the 7005 State Highway 183 Cisco, TX 76437

    o Transferred full proceeds of $453,510.95 on 11/16/22

- Sold A60 Airship

    o Transferred full proceeds to SBA and DOJ of $1,150,000.00

- Sold lot on US HWY19 in Dixie County, FL

    o Full proceeds of $8,976.09 transferred to title company 01/13/23

Mr. Walsh continues to work aggressively to liquidate and dispose of his assets in an orderly fashion, in compliance with his Plea Agreement Rider and in consultation with the government. He has submitted to the government a timeline of contracts that are scheduled to close within the next 120 days. The proceeds from

these closings will be transferred to the Department of Justice and, hopefully, will completely satisfy his restitution.

In addition, the Department of Defense has an interest in four (4) of Mr. Walsh's airships as an experimental platform for military purposes. The airships are unique, and it would likely be difficult or impossible for the DOD to source them elsewhere. Mr. Walsh has agreed to surrender the airships to the government, the value of which should exceed the restitution owed. If this transaction does not transpire, Mr. Walsh will continue to sell his assets and properties as expeditiously as possible to make his victim whole.

## III. MOTION FOR A DOWNWARD DEPARTURE

Factors exist that warrant a downward departure. Specifically, according to USSG §2B1.1, Application Note 21(C), if the Court determines that the figure for loss (intended or actual) substantially overstates the seriousness of the instant offense, especially as it related to the defendant's participation, a downward departure may be warranted. Here, these factors include: i) Mr. Walsh applied for $14,772,399 but received approximately half that amount, $7,818,167; ii) Prior to learning the existence of the instant investigation, Mr. Walsh voluntarily elected to withdraw his applications for four PPP loans.

7238802 _1

Mr. Walsh's election to withdraw these applications demonstrates that their inclusion in his sentencing calculation overstates his intended crimes and a departure is appropriate. Even if they are not included as intended loss, Mr. Walsh's actions demonstrate he was not driven blindly by greed, trying to claim as much money from the government as he possibly could. Instead, he withdrew these applications. Specifically, Mr. Walsh withdrew:

      A. American Blimp Company ($636,610),

      B. Airsign Airship Group ($1,111,488.00),

      C. Airsign, Inc. ($1,313,092) with Chase Bank, and

      D. Airsign Airships America ($809,642) with WebBank.

*See PSR Par. 16.* iii). Mr. Walsh has accepted responsibility for his criminal choices, but the Court should also acknowledge the choices he made to limit or avoid other criminal choices. A downward departure would do so.

Mr. Walsh offered and attempted to provide substantial assistance to the Government in the investigation of other crimes and remains cooperative. *See United States v. Fernandez*, 443 F.3d 19, 33 (2nd Cir. 2006) (Section 3553(a) analysis should include consideration of attempts at cooperation and characteristics evidenced by those attempts, even if government does not move to recognize the cooperation efforts); *see also United States v. Barner*, 572 F.3d 1239, 1250 (11th

7238802 _1

Cir. 2009) ("a judge basing a sentence under the considerations outlined in 18 U.S.C. § 3553 may take a defendant's substantial assistance into account even if a prosecutor withdraws (or does not file) a §5K1.1 motion."). Notwithstanding that the Government does not appear to be seeking a downward departure pursuant to USSG §5K1.1, Mr. Walsh's willingness and attempts to cooperate, and what that says about the nature of his character and the sincerity of his acceptance of responsibility, should be considered when the Court evaluates the overall seriousness of the offense, Mr. Walsh's actions, and whether a departure from the §2B1.1 loss calculation is warranted.

## IV. OBJECTIONS TO LOSS AMOUNTS

Mr. Walsh objects to the intended loss of $14,772,399 being used for the guideline calculation. The actual pecuniary loss of $7,818,167 is the only loss amount that should be considered by the Court.

On January 18, 2022, after the PSR was drafted, the Eleventh Circuit ruled *en banc* in *United States v. Brandon Romel Dupree,* that where the text of a sentencing guideline is not ambiguous, the Court cannot rely upon the guideline's commentary. *United States v. Dupree*, No. 19-13776, 2023 WL 227633 (11th Cir. Jan. 18, 2023). The Eleventh Circuit stated:

> Because the Guideline is unambiguous, he argues, we must not defer to the commentary's broader definition of controlled substance offense to include inchoate offenses. We agree.

<u>Id</u>. at *3 (footnote omitted). This holding represents a significant departure from previous Eleventh Circuit precedent and specifically overruled any contrary prior Eleventh Circuit decisions. *Id*. at 8-9. Following *Dupree*, as it applies to Mr. Walsh, the only loss the Court can and should consider is the actual loss he caused – so-called intended loss is no longer applicable. *See Id*. at *8 (the text is unambiguous and so "we have no need to consider, much less defer to the commentary…").

The question presented in the petition for the *en banc Dupree* rehearing was whether the Application Note 1 (§ 4B1.2—which renders certain conspiracy offenses "controlled substance offense[s]) is unenforceable because it adds to, not interpret, the plain text of the guideline. The Eleventh Circuit agreed with Dupree and plainly held where the text of a guideline is not ambiguous – using every available tool for statutory interpretation – the court should not apply the commentary to the guideline. <u>Id.</u> By extension, and as other courts have held, the term loss in Section 2B1.1 is not ambiguous, needs no further interpretation or clarification, and means actual loss and only actual loss.

7238802 _1

Section 2B1.1 of the USSG specifies an offense level increase "[i]f the **loss** exceeded $6,500." USSG **§**2B1.1(b)(1) (emphasis added). The commentary includes a lengthy advisory regarding how to calculate loss, including through the use of so-called intended loss. *Id*. at Commentary Application Note 3. However, because the word "loss" is not ambiguous, this Court need not, and cannot, use the guideline commentary to increase Mr. Walsh's offense level. Intended loss is no longer applicable.

The Third Circuit recently reached this same conclusion in *United States v. Frederick Banks*. *United States v. Frederick Banks, No. 19-3812 (3d Cir. 2022)*.[1] There, the Third Circuit held that the "loss enhancement in the Guideline's application notes impermissibly expands the word "loss" to include both intended loss and actual loss." Noting the Guideline does not mention "actual" versus "intended" loss; that distinction appears only in the commentary. That absence alone indicates that the Guideline does not include intended loss. *Id. (quoting United States v. Nasir, 982 F.3d 144, 471 (3d Cir. 2020). There is no ambiguity in the text of the* **§**2B1.1 guideline requiring the Court to look to the commentary for guidance. *Id*.

---

[1] At least one District Court has recently agreed with the analysis in *Banks* and has refused to "consider the commentary's definition of "loss" as including "intended loss" in applying § 2B1.1." *See United States v. McKinney*, 2022 WL 17547467 (EDMI, December 9, 2022).

7238802 _1

Following this reasoning, Mr. Walsh should not be sentenced based on a guideline loss amount which was unreasonably determined under guideline commentary based on "intended loss" not actual loss, particularly because the text of the guideline is clear. As such, the actual loss of $7,818,167 should be the loss amount for purposes of the loss calculation pursuant to USSG §2B1.

If the Court adopts the actual loss analysis of $7,818,167, an 18-level upward adjustment should be applied which renders a base offense level of 25. Per the Court's Order, a separate memorandum regarding the *Dupree* ruling will also be filed.

## V.   THE GOVERNMENT'S OBJECTION TO ¶26 SHOULD BE OVERRULED

The Government's objection to ¶26 of the draft Presentence Investigation Report should be overruled. The enhancement fails both legally and factually. The law does not support the enhancement and there is no factual foundation – that is to say, no evidence – in the PSR or otherwise to support the facts required to determine that this enhancement applies.

The Government incorrectly contends that the guidelines should include a two-level enhancement pursuant to USSG §2B1.1(b)(17)(A). The 11th Circuit has examined the application of this guideline and stated:

7238802 _1

[w]e hold today that, to trigger the [enhancement], at least in a case involving property held by a financial institution for a depositor, the financial institution

> (1) must be the source of the property, which we interpret as having property rights in the property, and

> (2) must have been victimized by the offense conduct.

*United States v. Muho*, 978 F.3d 1212, 1221 (11th Cir. 2020). The 11th Circuit further stated that the threshold question is whether "[i]n shorthand, the financial institution "holds" the property" and "[t]he financial institution must be a target of the offense conduct." *Id*. at 1222. The standard the government proposes, which the 11th Circuit has rejected, is akin to "affected" rather than "deriving from." *Id*.; *see also Stinson*, 734 F.3d at 186 ("mere tangential effects on financial institutions will not support application of the enhancement.").

Here, the SBA, not a financial institution, is the source of the property and no financial institution was victimized by the conduct. Rather, the financial institution administered the loan and was repaid by the SBA, who is the victim in this case and who will receive restitution from the Defendant. "The loans were administered by the private sector (e.g., banks, credit unions, existing SBA Section 7(a) lenders), but they were fully funded and guaranteed by the federal government." *Sport & Wheat, CPA, PA v. ServisFirst Bank, Inc.*, 3:20-CV-5425-TKW-HTC, 2020 WL 4882416 (N.D. Fla. Aug. 17, 2020).

The Defendant's conduct here (albeit illegal) is akin to his cashing a check issued by the SBA. The SBA offers and guarantees funds, and the Defendant presents information to a financial institution to obtain the benefits of that offer. Similarly, a consumer presenting a check to the financial institution is asking that financial institution to honor the guarantee of that document and to provide the consumer with funds on behalf of the check issuer. The 11th Circuit could not be more clear here –

> [i]n no way would the guideline apply to either ordinary wire transfers or checking transactions, not because of the source requirement, but because of the victimization requirement.

*Muho*, 978 F.3d at 1226. They also observed the guideline does not apply to a check cashing scenario because:

> [f]unds pass from one bank to another, not through a bank. The sending bank possesses the funds initially; the recipient bank possesses them ultimately.

*Id*.; *See United States v. Huggins*, 844 F.3d 118, 122 (2d Cir. 2016) (no enhancement for "passage of money through a financial institution").

Even if the Government's arguments were legally accurate, which they are not, the Government's claim requires factual support not present here. The 11th Circuit mandated "[t]he source prong requires an intentional, close examination and finding of from whence the property is derived[.]" The government has provided

30

zero factual support for such an intentional examination in this case. For example, the government contends:

> in the event of a default by a borrower – including one related to a borrower's conviction for PPP-related fraud – the lender must take numerous steps before seeking a guaranty purchase from the SBA.

Doc. 27 at 2. But there is no discovery or evidence, and certainly no factual support in the PSR, that any lender took any steps here, let alone numerous steps, and there is no evidence in the PSR or otherwise that the banks were actually harmed in this case – specifically and based on actual evidence. The government also claims that the financial institutions "were temporarily deprived of their own funds until the SBA made guarantee purchase payments for Mr. Walsh's PPP loans." But again, there is no evidence in the PSR or the discovery to support this conclusion and the government's own conclusions based upon its reading of the facts is not sufficient to support an enhancement of this nature.

In addition, the Government's own conclusion does not support the imposition of this enhancement under (17)(A). The government concludes that the enhancement must: be included in Mr. Walsh's guideline calculation in this case. By fraudulently borrowing from financial institutions, Mr. Walsh *put the financial safety and soundness of those institutions at risk*; Doc. 27 at 3 (emphasis added).

7238802 _1

However, that argument is irrelevant because it relates to an enhancement under §2B1.1(b)(17)(B) – jeopardizing the financial safety of a financial institution – which plainly does not and cannot apply here. Rather, the Government has claimed that (b)(17)(A) (*not* (B)) applies based on the alleged harm caused to financial institutions.

The enhancement simply does not fit these facts and should not be applied.

## VII. TEXAS PROPERTY

The Final PSR (paragraph 65, note 8) discussed a Texas property not previously disclosed to Probation. Mr. Walsh was the grantor of the Walsh International & Irrevocable Family Trust Indenture (the "Trust"), legally removing all his rights of ownership to the assets and the trust on August 17, 2020. The legal ownership of the trust and its assets belongs to the Trustee, Georgetown Trust. The Ovalo property is wholly owned by Shiloh Oil Company and 1402 CR 161 LLC, a company owned by the Trust. The property is utilized for business purposes for Shiloh Oil Company. Defense counsel has provided this information to the government, as well as the name of the trust attorney in hopes of resolving this issue prior to sentencing. Mr. Walsh will be prepared to address this issue further at sentencing if it cannot be resolved.

However, Mr. Walsh wants to be clear that he was never attempting to hide assets. He disclosed this Trust to the government at least twice and disclosed the specific real property to Probation on September 22, 2022.  The Walsh Family International & Irrevocable Trust was timely disclosed in the financial disclosure forms to Probation prior to completion of the draft Pre-Sentence Investigation Report. In addition, on December 22, 2022, in connection with the Department of Justice's Civil Division parallel investigation, Mr. Walsh provided the government a Financial Statement of Debtor form and on page 3 stated:

> The Walsh Family International & Irrevocable 1) the trust has no liquid money other than a couple thousand to cover trust fees a 2) the Trust does own Shiloh Oil Company Inc which still has operated at a loss and has not recognized a profit yet.

Mr. Walsh also sent a letter to U.S. Probation Officer Minafield on September 22, 2022, requesting permission to travel to the Texas property for business purposes. Clearly Mr. Walsh would not be providing the address of a location to the United States government, while announcing his stay at this property for an extended period of time for business, if he was trying to hide the property.  The letter to Probation is attached and incorporated as ***Exhibit B.***

7238802 _1

## VII. CONCLUSION

Mr. Walsh respectfully requests the Court to consider the factors and arguments presented and sentence Mr. Walsh to a fair and just sentence of 18 months with no fine.

Respectfully Submitted,

| | |
|---|---|
| */s/ Nicole Hughes Waid* | */s/David G. Lazarus* |
| Nicole Hughes Waid | David G. Lazarus (*pro hac vice*) |
| FisherBroyles LLP | Verrill Dana LLP |
| Florida Bar #0121720 | One Federal Street |
| 625 Tamiami Trail North, Suite 203 | 20th Floor |
| Naples, FL 34103 | Boston, MA 02110 |
| P: (202) 906-9572 | P: (617) 292-2859 |
| E: Nicole.waid@fisherboyles.com | E: dlazarus@verrill-law.com |

## CERTIFICATE OF SERVICE

I, *David G. Lazarus*, attorney for Patrick Parker Walsh, do hereby certify that I have, this day, filed the foregoing with the Clerk of Court via the CM/ECF system, which has caused a true and correct copy to be served on all counsel of record.

*/s/ David G. Lazarus*
David G. Lazarus, Esq.

## CERTIFICATE OF WORD LIMIT

I, *David G. Lazarus*, attorney for Patrick Parker Walsh, do hereby certify pursuant to L.R. 7.1(f) and L.R. 5.1(C) that this Sentencing Memorandum contains less than 8,000 words in 14-point font.

*/s/ David G. Lazarus*
David G. Lazarus, Esq.

7238802 _1