1           UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF FLORIDA
2               GAINESVILLE DIVISION

3                              )
   UNITED STATES OF AMERICA,   )
4                              )
               Plaintiff,      ) Case No: 1:22cr24
5                              )
           v.                  ) Gainesville, Florida
6                              ) January 31, 2023
   PATRICK PARKER WALSH,       )
7                              ) 11:03 AM
               Defendant.      )
8   _____ )

9           TRANSCRIPT OF SENTENCING
       BEFORE THE HONORABLE ALLEN C. WINSOR
10         UNITED STATES DISTRICT JUDGE
              (Pages 1 through 101)

11

12

13

14

15

16

17

18

19

20

21           *LISA C. SNYDER, RPR, CRR*
       Official United States Court Reporter
22    111 North Adams Street, Tallahassee, FL 32301
          (850)567-1374 * lisasnydercr@gmail.com

23

24      *Proceedings reported by stenotype reporter.*
   *Transcript produced by Computer-Aided Transcription.*

25

APPEARANCES:

For the Plaintiff:     United States Attorney's Office
By:  JUSTIN KEEN
     KATHERINE C. KERWIN
     Asst. U.S. Attorneys
     justin.keen@usdoj.gov
     katherine.kerwin@usdoj.gov
111 N. Adams Street, Fourth Floor
Tallahassee, Florida 32301

United States Attorney's Office
By:  DAVID BYRON
     Asst. U.S. Attorney
     david.byron@usdoj.gov
300 E. University Avenue, Suite 310
Gainesville, Florida  32601

For the Defendant:     Fisherbroyles LLP
By:  NICOLE HUGHES WAID
     Attorney at Law
     nicole.waid@fisherbroyles.com
127 Montrose Rive, Suite 203
Fort Myers, Florida  33919

Verrill Dana
By:  DAVID G. LAZARUS
     Attorney at Law
     dlazarus@verrill-law.com
1 Federal Street, 20th Floor
Boston, Massachusetts  02210

1                    **P R O C E E D I N G S**

2            (Call to Order of the Court at 11:03 AM on Thursday,

3      February 2, 2023.)

4                  THE COURT:  Good morning.  Have a seat, please.

5                  All right.  We are here in case 1:22cr24.  It's United

6      States versus Patrick Walsh.

7                  We are here for a sentencing.  Mr. Walsh is here.

8                  Good morning, sir.

9                  THE DEFENDANT:  Good morning.

10                  THE COURT:  He is with his lawyers, Ms. Waid and

11      Mr. Lazarus.  Good morning to both of you.

12                  And for the government we have Mr. Keen, Mr. Byron,

13      and Ms. Kerwin, all Assistant U.S. Attorneys.

14                  And Officer McCommon is here as our probation officer.

15                  Everybody ready to begin, Mr. Keen?

16                  MR. KEEN:  Yes, Your Honor.  Thank you.

17                  THE COURT:  Ms. Waid?

18                  MS. WAID:  Yes, Your Honor.

19                  THE COURT:  Okay.  I will start by asking you,

20      Mr. Walsh, if you have had a chance to go through the

21      presentence investigation report and the addendum that went with

22      it.  Have you seen those?

23                  THE DEFENDANT:  Yes, Your Honor.

24                  THE COURT:  Have you gone through those carefully with

25      your lawyers?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And have they been able to answer any

3    questions you had?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Do you have any more questions for them?

6          THE DEFENDANT:  No, sir.

7          THE COURT:  All right.  Very good.

8          Mr. Walsh, I tell you now that you have what's called

9    the right of allocution, which means you will have the right to

10   tell me anything you'd like in mitigation of your sentence.

11   That will be later in the hearing.  Some defendants do, some

12   don't.  You don't have to, but I want to make sure you know

13   that's an option.

14         All right.  So we have got a lot to talk about.  I

15   will start by noting for the record everything I have seen.

16   There have been a lot of recent filings, including two last

17   night.

18         Of course, I have gone through the presentence

19   investigation report.  I have seen both sides' objections.  I

20   saw the government's reply to the defendant's objection.

21         I saw the government's initial sentencing memorandum.

22   That's at Document 31.  The defense's at Document 32, which I

23   did see had a number of letters attached to that.  I have

24   reviewed all of those.

25         Then there was a supplemental filing about the loss

1    amount from the defense at Document 33.

2           The government's memorandum regarding the property in

3    response to my question on Friday, that's Document 34.  And then

4    the two filings last night, which I think were 35 and 36, one

5    from each side.  That's right.

6           Is there anything else I should have seen, Mr. Keen?

7           MR. KEEN:  No, Your Honor.

8           THE COURT:  Ms. Waid?

9           MS. WAID:  No, Your Honor.

10          THE COURT:  Very good.

11          I think, probably a good starting point -- I do have a

12   lot of questions about the financial situation.  It seems

13   like -- it's not clear to me what's what in that department.

14   And it matters for purposes of today in terms of weighing the

15   extent there was acceptance of responsibility.  And, also, there

16   has been a request from the defendant not to impose a fine, and

17   certainly that's something that would be a consideration there.

18          But I wonder if we can start by addressing the issue

19   of the Texas house, Ms. Waid.  The government filed something

20   yesterday saying that the defense had presented to the

21   government that it's one thing, and included some pictures about

22   some outbuildings and things that didn't look too nice.  And

23   then the government found some realtor posting that painted an

24   entirely different picture.  And I just wanted to see what we

25   are missing there in terms of -- it does look like something

1 | other than what it was presented to be by the defense.

2 | MS. WAID: Sure, Your Honor.

3 | So, the distinct question from the government was

4 | what -- and I apologize because I am losing my voice so I'm

5 | sorry. I will try to speak up as much as I can -- was whether

6 | it was used for business purposes.

7 | This is a business property. I think the biggest

8 | question was; was it disclosed? And it was definitively

9 | disclosed to probation that Mr. Walsh takes his family. He has

10 | 11 kids. They are homeschooled. So he takes them to this

11 | property, which is in the middle of nowhere in Texas, to work on

12 | his oil projects. So we are talking oil fields and projects in

13 | the middle of Texas.

14 | And is there a residence? Yes. Absolutely. There is

15 | a residence on the property so that the family can stay there

16 | while Mr. Walsh is working, which, again, was disclosed to

17 | probation. He went there for two months. It was in November

18 | and December to work on oil projects with his family.

19 | The dog photo -- they took their dog. The dog got

20 | lost. That's the Facebook photo.

21 | They are working, though, and the pictures that were

22 | provided by the defense to the government in response to their

23 | question was, there is a shop. There are offices. They keep

24 | calling them barndominiums. It's a place where actually people

25 | can go and do business. People have stayed there for business.

1       The four people stayed there that we provided an

2 affidavit for.  Another person stayed there for a night.  But

3 people come to the property because there is nothing else

4 around.  I think the closest hotel is about 25 miles away.  So

5 it's used a business property.  It was disclosed as a business

6 property.

7       It is, technically, owned by a trust which was

8 disclosed to probation.

9       THE COURT:  Where was that disclosed to probation?  I

10 went back -- and I don't always see the underlying documents but

11 I did in this case, and it seemed like the disclosure that he

12 completed, that mentioned the trust, didn't provide the

13 information that the disclosure sought.  Is that not right?

14       MS. WAID:  So the question in the probation forms was:

15 Disclose the trust.  It doesn't ask for an independent kind of

16 analysis of every single asset the trust owns.

17       Mr. Walsh doesn't, technically, own those.  The

18 trustee technically owns those.

19       THE COURT:  It asked for your interest in the trust

20 assets and he doesn't provide an answer.

21       MS. WAID:  The interest is currently not making any

22 money, so as any beneficiary of the trust, there is no money.

23 And I think we provided the bank statement last night in our

24 filing.  There is no actual money coming into the trust so he is

25 not getting any interest in that.

1         THE COURT:  But he put the money in the trust, right?

2    I mean, you don't dispute -- I want to make sure I understand

3    those because your latest filing says there is nothing wrong

4    with having a trust.  As a general matter, that's a fair

5    statement.

6         In this case, at the time Mr. Walsh was stealing

7    millions and millions of dollars from the federal government, he

8    was creating this trust and putting assets into it; correct?

9         MS. WAID:  I don't believe that -- he was putting

10   assets in the trust.  The trustee would put assets into the

11   trust.  Yes; that's correct.

12        THE COURT:  Well, it was all his doing.  You are not

13   disputing that?

14        MS. WAID:  No.  No, Your Honor.

15        THE COURT:  In other words, he could have not put it

16   in the trust.

17        MS. WAID:  Right.

18        THE COURT:  And he took the money -- because one of

19   the things I want to talk about, too, a lot of your presentation

20   is that he wasn't buying Ferraris.  He was helping out his

21   businesses and things like that.  That's not entirely clear,

22   from the record, where all the money went.  We have all the

23   money laundering transactions that went to a lot of entities

24   that weren't otherwise reflected in any of the materials I

25   have -- these other entities, I guess, some sort of business

1    investments.

2              MS. WAID:  Right.

3              THE COURT:  But the bottom line is, he was taking

4    assets and putting them out of the reach of creditors in a trust

5    in Belize that he is the beneficiary of.

6              MS. WAID:  He and his wife and his kids.

7              THE COURT:  He and his wife are the primary

8    beneficiaries.

9              MS. WAID:  Right.  Right.

10             THE COURT:  Okay.  And --

11             MS. WAID:  Although, just for the record, for

12   clarification, I don't believe that they actually get the

13   assets.  I believe it's his descendents that get the assets from

14   the trust document, just to keep the record clear.

15             I am not disputing with you.  I think that's --

16             THE COURT:  Say that again.

17             MS. WAID:  Is that right?

18             Yeah, I think the trust document actually says it's

19   his descendents that get the assets, not technically the

20   beneficiary, if I am accurate in what the trust document says.

21             I am not disputing --

22             THE COURT:  After he dies?

23             MS. WAID:  Right.

24             THE COURT:  For the entirety of his life, and his

25   wife's life, the entire purpose of the trust is to support him

1    and to do things that are in his interest; right?

2            MS. WAID:  Correct.

3            THE COURT:  Including, in your view, buying this

4    million dollar beautiful home in Texas; correct?

5            MS. WAID:  For businesses purposes.  Correct.  I am

6    not disputing --

7            THE COURT:  He is living in it.

8            MS. WAID:  He -- technically he lives in Florida.  He

9    stays there for business.

10            THE COURT:  Okay.

11            MS. WAID:  Yeah, in Texas.  It's an oil company.  He

12    does stay there with his family for a month or two at a time

13    when he was working on an oil project, and then he comes back to

14    Florida.

15            I'm not disputing with you, Your Honor, that is in the

16    trust's name and if the government wants to seek that property

17    if he doesn't fulfill his restitution, which he has a plan to

18    fulfill his restitution, I think that's an argument we can have.

19            I think our argument was more so it was disclosed to

20    the government.  Probation knew exactly where it was.  He wrote

21    to the probation officer and said, We are staying at this

22    business property.  This is the address.  We are going to be

23    here for two years.

24            I just don't want it to be colored on the record that

25    he was trying to hide something.  I don't think he is.  Whether

1    or not the government has access to that money I think is, you

2    know, an argument that can be made if restitution is for some

3    reason not fulfilled, but --

4              THE COURT:  Let me ask this: He has access to it to

5    some extent.  It's not like a trustee just decided, Hey,

6    Mr. Walsh, I bought this million dollar property in Texas on my

7    own volition, right?

8              MS. WAID:  Right.

9              THE COURT:  And, in fact, the other Texas property

10   that was sold to pay a small portion of the restitution was

11   owned by the trust.  Correct?

12             MS. WAID:  It was owned by the company.  It was

13   owned -- yes.

14             THE COURT:  It was owned by Shiloh.

15             MS. WAID:  Yes.

16             THE COURT:  And your position is, Shiloh is entirely

17   owned by the trust?

18             MS. WAID:  Yes.  Technically, yes.

19             THE COURT:  What do you mean "technically?"

20             MS. WAID:  I mean, yes.  In the trust documents it is

21   owned -- the asset is owned by the trust.

22             THE COURT:  All right.

23             So he is paying restitution with assets that aren't

24   his?

25             THE DEFENDANT:  Your Honor, the property in Cisco,

Texas, an EIDL loan was used to purchase that property.  So that
property was sold and the funds transferred back.

One important point regarding the trust is no actual
money was transferred into the trust outside of less than a
couple thousand dollars for trust fees.

THE COURT:  I thought $200,000 in cash was
transferred.

THE DEFENDANT:  No.  Initially when the trust document
was set up, before any assets were actually transferred, this
was the intended -- what we would do, but no assets were
actually transferred outside Shiloh -- the company Shiloh was
formed under the trust.

Another point that is very important is that the Ovalo
property was purchased with outside capital.  So no funds, from
the government funds, were funds that were held in a trust or
anything like that were used to purchase that property.

MS. WAID:  There were investors that actually
purchased the property.

THE COURT:  That purchased the home in Texas?

MS. WAID:  Yes.  It didn't come from -- it did not
come from Mr. Walsh's personal finances.

The first $10,000 Mr. Walsh put down to hold the
property open, but then investors actually invested in the trust
and purchased the property, not with Mr. Walsh's funds.  And we
can provide that information to the --

1    THE COURT:  Well, that would be helpful because that's
2  contrary to my understanding.
3    The Walsh Family International and Irrevocable Trust
4  has outside investors?
5    MS. WAID:  It has people who actually put money into
6  the trust to invest in Shiloh because it's actually a growing
7  company.  It's not currently making any income, but the belief
8  is it will make some income and so there were outside investors
9  who actually purchased the property.  And Mr. Lazarus can pull
10  that up for Your Honor.
11    THE COURT:  Forgive my confusion, but I thought your
12  position was that Shiloh, the entity, owned the house.  And then
13  that the trust owned Shiloh.
14    MS. WAID:  Shiloh --
15    THE DEFENDANT:  Sorry.  It's really confusing.
16    So an LLC owns the property there in Texas.  That's
17  owned by the trust.
18    THE COURT:  This is the CR -- the LLC with the --
19    THE DEFENDANT:  1402 --
20    THE COURT:  Okay.  And you are the managing member of
21  that?
22    THE DEFENDANT:  So, I incorrectly signed that on one
23  of the documents for the loan for that, but the trustee is the
24  managing member of that property.
25    All the funds used to acquire that property are funds

1  from outside parties investing in Shiloh Oil products.  So,

2  Shiloh -- the Shiloh Oil Company hasn't turned a profit yet.

3  It's kept in existence by outside investors.

4          THE COURT:  Who get what in return?  An interest in

5  what?

6          THE DEFENDANT:  Different oil well projects.  So, we

7  work together and identify an oil well project, people put money

8  together for an oil well project.

9          THE COURT:  For a particular project and not for --

10 who has the financial interest in Shiloh?

11         THE DEFENDANT:  So the trust owns Shiloh.

12         THE COURT:  Exclusively?

13         THE DEFENDANT:  Exclusively.  Yeah.

14         THE COURT:  Okay.

15         And have the entire -- well --

16         THE DEFENDANT:  Myself and my family.

17         THE COURT:  You and your family have the trust.  The

18 trust has Shiloh.  Shiloh has this CR something LLC?

19         THE DEFENDANT:  For the specific property.

20         THE COURT:  And that owns the house?

21         THE DEFENDANT:  Yes.

22         MS. WAID:  For this specific property.  Yes.

23         THE COURT:  Right.  But you were saying, Ms. Waid,

24 that outside investors had some interest in the house.

25         MS. WAID:  Well, the money came not from Mr. Walsh

1   personally to purchase the house.  They had put money in the

2   trust account, which Mr. Lazarus is pulling up for you.

3         THE COURT:  So then outsiders do have an interest in

4   the trust, or outsiders do not have an interest in the trust?

5         MS. WAID:  I don't believe they get any --

6         THE DEFENDANT:  Yeah.  So --

7         THE COURT:  They don't get benefit but they put money

8   in?  Who are these people?

9         THE DEFENDANT:  Outside investors work together on oil

10  projects and that's how Shiloh Oil Company has any type of

11  capital from outside parties.

12        Those funds are then used to support oil projects, or

13  other things that benefit Shiloh Oil Company -- this house,

14  equipment, things like that for the oil company.

15        THE COURT:  This doesn't make any sense to me.

16        You're saying there are outside investors who give

17  money to this entity that only you and your family benefit from.

18        THE DEFENDANT:  No.  So, there are oil projects,

19  right?  So, let's say, we want to do an oil project called the

20  Davis Oil Lease, and different investors and Shiloh will all

21  come together and say, To get interest in that oil project we

22  are each going to put X amount of dollars to complete that

23  project.  Say it's a million dollars to complete that oil

24  project.  So, an investor may put in 250,000 and they get

25  25 percent of that project.  And then, the revenue that that oil

well produces, 25 percent will go to that oil investor
indefinitely.

        THE COURT:  Is it the case that then, for this
individual project, there would be yet another entity set up
that would have common ownership by say, Shiloh, and this other
person that is putting in 25 percent?

        THE DEFENDANT:  No.  They get title to it.  That's how
oil wells work.  You get title to it.  You don't own interest of
it.  So, by investing in the project with Shiloh they get an
interest in that oil well in perpetuity.

        THE COURT:  They get interest in the well but not in
Shiloh?

        THE DEFENDANT:  Right.  In the profit from that
project.

        THE COURT:  So, Shiloh would have a partial interest
in a particular well, and that these other people --

        THE DEFENDANT:  Shiloh would do the work and they --

        MS. WAID:  Use the property as base camp for their
work.

        THE DEFENDANT:  And they would supply the capital to
fund the project.

        THE COURT:  Okay.

        But the bottom line is -- there is no dispute that he
incurred debt to buy this property, right?  He guaranteed the
loan personally?

1      MS. WAID:  For the property, yes.

2      THE COURT:  At a time that all of this was going on --

3  actually last summer, at a time that he was saying he was going

4  to pay $7 million back he was incurring debt for this home that

5  benefits him, tremendously -- this million dollar home?  I mean,

6  do you see what I am saying?  I am trying to make sure I have

7  the facts right.

8      MS. WAID:  Right.

9      He personally guaranteed it.  So, that's the debt to

10  the trust technically.  And he has lived there when he is

11  working, yes.  And the other people who are working on projects

12  have use to that as well.

13      So, if there is an oil well that they are working on a

14  project, the whole purpose of the property was this is a central

15  location in Texas so that they can get to whatever project they

16  need to go to.

17      THE COURT:  Okay.

18      And so the -- he is not the owner or the managing

19  member of this LLC that owns it?

20      MS. WAID:  No.

21      THE COURT:  Give me just moment here.

22      (Pause in proceedings.)

23      THE COURT:  So, the Cisco property, 7005 State Highway

24  183, that's been liquidated, correct?

25      THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.  That wasn't a trust property?

2          MS. WAID:  But it was purchased with EIDL loan funds,

3     Your Honor.  That's why we liquidated it.  Returned the money to

4     the government.

5          THE COURT:  Why is it listed as a real estate asset,

6     and the Oslo property is not, if they both -- the reason the

7     Oslo property, if I am pronouncing that right, was not listed is

8     because it's owned by the trust and not Mr. Walsh.  The same

9     would be true of the Cisco property, correct?

10          MS. WAID:  Yes, but the Cisco property had already

11     been identified by the government.  We've been working with them

12     to actually sell it off.

13          THE COURT:  How can you sell it off if it's trust

14     property?

15          MS. WAID:  With permission from the trust.

16          THE COURT:  Okay.

17          And the trust won't give permission to liquidate other

18     assets to pay restitution?

19          MS. WAID:  I don't think the trust has been asked if

20     it would because Mr. Walsh already had a plan to pay off

21     restitution with other assets that he personally owns.  So, in

22     the works right now, there are airships that he is selling.

23     There are properties that he was selling.  He was supposed to

24     sell off his business but that fell through, so he is selling

25     off other assets.

1    If he can't sell off, you know, his other assets to

2 actually make due on his restitution that would come into play.

3 But it doesn't need to because there are other assets which he

4 hopes to liquidate within the next 120 days, or so, in order to

5 pay off his restitution.

6    THE COURT:  Okay.

7    And then the entirety of his business holdings then is

8 this Airsign Airship Group and its related entities?

9    MS. WAID:  I'm sorry.  I didn't hear your question.

10    THE COURT:  I am looking back at the net worth

11 statement.  In terms of businesses, it identifies just the

12 Airsign Airship Group.

13    MS. WAID:  Yes.  And I think it was ten million or so

14 was what it was listed as.

15    THE COURT:  Six to nine.

16    Part of the problem here, I think, is that a lot of

17 times when you are talking about entities and things like that,

18 if an organization owns a piece of real estate, and an

19 individual owns that entity or organization, then the assets of

20 that business that that individual has is the company's, and the

21 company's asset is the real estate.

22    Here there is sort of a blending.  You know, sometimes

23 on these documents it will say, Well, he owns this Walsh Land

24 Company -- I may have that name wrong -- and it owns property.

25 But then its' property show up as his assets.  And then we have

a discrepancy here that I identified about how the Texas

properties are treated differently.  And it's hard to get --

It seems like a very messy situation.  And when the

representation is made that he is doing everything he can, and,

therefore, has actually accepted responsibility, it's just hard

to find that to be the case looking at all of -- this messy

situation.

It would seem like -- it would seem like we would have

a different picture here.  There are all of these entities.  I

don't know what's what.  I don't know who they are.  There is

very little information on what this Shiloh is doing, how it

came to be.  So it's hard for me to evaluate the acceptance of

responsibility.

Do you see what I am saying?

MS. WAID:  I do.  I completely understand what you are

saying, Your Honor.

I think that in the very beginning we had worked out

kind of a clear path for restitution that has been, you know --

we have been working with the government to do so, and have had

almost daily communications, or weekly communications, about

that path.

And so, we originally identified all of these

properties.  Originally Path A was the sale of the business and

that fell through.

So, then Path B we actually submitted to the

government the different properties and we have been providing

restitution when those properties have sold.  It goes into

escrow and then it goes to DOJ.  I believe there is 1.6 -- well,

technically 1.4.  Two-hundred thousand has already gone to the

SBA.

From our purposes, it's been kind of a transparent

path of how restitution is going to come forth.  And we have

other kinds of things in the works to sell off the rest of the

properties.  And we have been trying and actually speaking with

the government in order to get that done in the best way

possible.

There was a chance for the Department of Defense to

buy the blimps; that fell through.  We are consistently working

daily.  Mr. Walsh is working daily to get these properties sold

in order to fulfill his restitution.

From our perspective, that's what he has been working

on, this kind of clear path of getting that done.  And he hopes

to do so within the next 120 days, be able to pay off all of his

restitution.

THE COURT:  Okay.

Let me ask one other thing: The PSR said the

beneficiaries of the trust were the wife and children, but, as a

factual matter, that's not entirely correct.  That he is --

MS. WAID:  He is a beneficiary.

THE COURT:  Okay.

1          All right.

2          MS. WAID:  We obtained the trust documents from the

3    trustee and provided that to the government, I believe,

4    yesterday.

5          THE COURT:  Okay.

6          Let me hear from you, Mr. Keen.

7          MR. KEEN:  As to which part?

8          THE COURT:  As to anything you would like to say in

9    response to anything.

10         MR. KEEN:  Okay.

11         As far as the asset portion of the government's

12   presentation, Ms. Kerwin is handling that part.  I have other

13   things to say about other issues.

14         THE COURT:  Okay.

15         MS. KERWIN:  Good morning, Your Honor.

16         THE COURT:  Morning.

17         MS. KERWIN:  My name is Katherine Kerwin.  I am the

18   financial litigation coordinator for the U.S. Attorney's Office

19   here in the Northern District of Florida.

20         As part of what we need to do here is ensure that full

21   restitution is repaid we have, you know, looked at a lot of

22   documents.  And I agree with a lot of what you have stated so

23   far.

24         THE COURT:  Let me just interrupt you real quickly.  I

25   want to make something clear.  My job here is not to enforce any

restitution amount.

The restitution has been stipulated to.  It's going to be the $7.8 million.  That will be part of the criminal judgment along with the forfeiture money judgment.

The reason I am so interested in this is because it goes to the overall characteristics of the defendant, which is an appropriate sentencing consideration.

So I just want to make that clear.  I hope I did earlier.

I didn't mean to cut you off but I just wanted to state that.

Go ahead.

MS. KERWIN:  Thank you.  Yes, I understand that.

One of the reasons we needed to evaluate everything was to see whether Mr. Walsh was being fully cooperative and honest in what we were talking about as we are working through this.

So the presentation by the defense regarding the trust and the property was confusing and it's not just because it's hard to understand.  It's because it's intentionally confusing.

Just based on a review of all the documents, we show that Mr. Walsh has controlled the sale and the purchase of these properties.

Now to say that he miss-signed a document, I can't really put any weight on that because we have one document

1    signed as the CEO of the trust, and another document signed as

2    the managing member of the 1402 LLC.

3           There were some questions about these investors.  And

4    I have never heard people described as "investors" giving money

5    to Mr. Walsh to purchase these properties.  But I look at the --

6           I have an Exhibit 4.  It's the deed to secure debt and

7    security agreement.  I do see some companies listed on here.

8    And what I am thinking is that they gave Shiloh Oil, and Mr.

9    Walsh, a loan to purchase the property.

10          If we look to page two of that --

11         THE COURT:  This is Document 34?

12         MS. KERWIN:  Thank you.  Yes.  Document 34.  It would

13    be attached in the first batch of exhibits.

14         THE COURT:  So 34-1?

15         MS. KERWIN:  Yes.  We are looking at Exhibit 4, which

16    would be, maybe, ten pages down.

17         THE COURT:  I have got Exhibit 4.  It's page 8,

18    document 34-1.

19         MS. KERWIN:  Thank you.  Yes.  That's the deed to

20    secure debt and security agreement.

21          So what I was talking about these businesses I see in

22    the first paragraph.  And then, on the second page, if we look

23    at little -- paragraph little (a) where they have agreed to

24    repay $575,000 by July 5th, 2024.  So that is a benefit, I

25    guess, that the investors would get.

It's still not clear to me they are investors in Shiloh Oil, anything beyond just businesses who gave a loan. So, I don't have any other information to support --

THE COURT: I don't think that's disputed. I didn't understand -- Ms. Waid can correct me if I'm wrong -- I didn't understand them to say that other investors have a financial interest in the entity Shiloh Oil LLC, or that may be the one that's converted to a corporation now.

I understood the entirety of that entity was owned by the Walsh Family Trust.

MS. KERWIN: I agree that Shiloh Oil is owned by the Walsh Family Trust.

I also have to emphasize the Cisco, Texas property that has been sold. For purposes of discussion of the assets that Mr. Walsh and his businesses own, there is no distinction whether it was purchased with fraudulently obtained funds or purchased with some other funds.

For the purposes of the discussion, we need to talk about all the assets. This is a big asset, and if Mr. Walsh can control the sale of the Cisco property, he can also control the sale of the Ovalo, Texas property.

And we have seen written in the letter of the documents about how he did control the purchase back in July of 2022, while, presumably, the plea agreement was being negotiated with the government. And now that property is owned by the

1    trust.

2           I am not necessarily disputing that the trust is not a

3    legal trust.  I don't know if it is.  Let's assume it is.  But

4    the fact that this valuable property was moved beyond the reach

5    of the government, during the negotiations, is not a good faith

6    action.

7           May I address more about that property?

8           THE COURT:  Certainly.

9           MS. KERWIN:  So we have two buildings on that land; we

10   have the main house and then this, what the realtor called a

11   "barndominium."  I have never heard that word before.  It

12   doesn't really matter.  It's an outbuilding that has a shop at

13   the bottom and a place to stay up top.  I would venture to guess

14   that employees of Shiloh Oil never stay in that main house.

15          For Mr. Walsh to assert that he can own a valuable

16   property and use it for the benefit of his family, really, I

17   would say to the detriment of the government, that's not

18   something that we would agree with.

19          Pursuant to the plea agreement, his personal residence

20   is already protected.  Unless he violates the plea agreement,

21   that property will be kept safe for him and his family -- the

22   one in Williston.  Yes.  Pardon me.  The house in Williston.

23          And then --

24          THE COURT:  And the one with the ten acres.  Not the

25   surrounding hundred acres or so?

1        MS. KERWIN:  Correct.  Whether those surrounding acres

2    can be sold -- they might be encumbered by the mortgage that is

3    on the property.  We will have to see.

4        But the business property appears to me to be a second

5    home for the family to stay in while Mr. Walsh travels on

6    business, which for a person that is not obligated to repay $7.8

7    million in restitution, that might be not a problem.  But that's

8    what we are dealing with here.

9        So, that is not something that we would say is

10   indicating full cooperation and an indication to pay back the

11   restitution.

12       Going back to the plea agreement, we can assume that

13   he said: Yes, I want to repay seven-and-a-half million.  But the

14   problem is that he has produced limited information to show here

15   are the properties that I have that will add up to

16   seven-and-a-half million.

17       As time has gone on, we have discovered more

18   property -- more and more property.  Every time I have

19   discovered something new maybe it appeared that they -- that

20   defense has already provided the information.

21       A case in point would be about the blimps -- the

22   airships.  When I wrote the sentencing memo I suggested that

23   there were eight airships that had not been disclosed.  And then

24   yesterday, or the day before, the defense did provide me with a

25   list of actually 15 -- 15 airships that I was not aware of.

1          I would have included that but now we know it's not

2     just eight airships that he owns.  It's actually 15.  So I still

3     don't think that the value of those airships, or the businesses,

4     were properly disclosed for the PSR.

5          We need to talk about all the assets.  Not just the

6     assets that Mr. Walsh would choose to tell the government about.

7          MS. WAID:  Your Honor, can I clarify the record on

8     that one?

9          THE COURT:  Sure.

10          MS. WAID:  Those 15 airships were actually disclosed

11    to the government in an email in September.  If part of the

12    government doesn't read communications, Mr. Walsh really

13    shouldn't be held liable for that.

14          THE COURT:  Are they owned -- who owns the airships?

15          MS. WAID:  Airsign Group, Your Honor.

16          But it was on September 13th, 2022, that was disclosed

17    to the government.

18          The reason that we were speaking about specific

19    assets, Your Honor, is because that's what the plea agreement

20    was.  There was a negotiated Path B with specific assets.  And

21    he has been completely transparent in trying to sell those

22    assets.  I mean, we are talking about which escrow agent should

23    it go to, and how does it go there, and things of that nature.

24          So, for Ms. Kerwin to say that she just found out

25    about that yesterday, that may be accurate.  But it was

1    disclosed to the government in September.

2            Going back to my -- he is not trying to hide anything.

3    He has been sharing all of this with the government.  It was

4    literally part of a negotiation in a plea agreement that was

5    agreed to by the government.  They agreed to the Plan B.  And

6    now they might not like it, but we are still trying to actually

7    to fulfill Plan B -- fulfill all of the restitution.

8            THE COURT:  So your position is he has been very

9    transparent with his finances through this process?

10           MS. WAID:  So for the assets, we have been actually

11   speaking with the government the entire time about which assets

12   we were selling and how we are selling them, including

13   conversations with the Department of Defense and things of that

14   nature.

15           I have never spoken, frankly, in my 15 years this much

16   about restitution as we have in this case, so...

17           THE COURT:  This is an unusual case in that regard.

18           I mean, obviously most -- 90 percent of our cases here

19   don't have any restitution.  And, certainly, we don't have

20   instances where someone is asserting that they should have a

21   downward variance, or a downward departure, based on extensive

22   cooperation and acceptance of responsibility that is going above

23   and beyond to make sure everyone is made whole when we have all

24   of these different moving pieces.  And as I understood you to

25   say a moment ago that the trust, or the trust documents, were

1    disclosed yesterday.  And this case has been going on for quite

2    some time --

3            MS. WAID:  The trust was disclosed, Your Honor.  We

4    just didn't -- the documents.  We had not -- and, just for the

5    record, that's Document 35-1, Exhibit 1, was what I was

6    referring to with the September 13th email in the government.

7            THE COURT:  Right.  And so the judge sees it for the

8    first time over the weekend before a Tuesday sentencing, and

9    months into this thing.  So, I do -- I do have issues with the

10   idea that this has all been very transparent.

11           And you keep saying he has disclosed it.  I am looking

12   at the financial disclosure.  I am sure you have the same thing.

13   It says, Walsh Family International and Irrevocable Trust.  The

14   form asks: What's the value of the trust?  No answer.

15           What's the annual income from the trust?

16           What's your interest in the trust?

17           At that point, when I am looking at this, and the PSR

18   says the beneficiaries are the wife and children, it doesn't say

19   he is the beneficiary, which we know he is.

20           It doesn't say what his interest is here.  It says it

21   has no "liquid money" -- I don't know what liquid money is, as

22   opposed to other money.

23           It doesn't say -- it says it does own Shiloh Oil

24   Company, Inc. which has operated at a loss.  It doesn't say

25   anything about the assets that Shiloh, Inc. holds, which we now

1    know was a million dollar home.

2          It is not recognizing a profit.  You can have a

3    company that doesn't recognize a profit that has a substantial

4    value.  We all know that just from reading the newspaper.

5          And, so, this does not, in my view, come close to

6    telling the government the details that we need to know about

7    with this trust.

8          How would you know, from looking at this document,

9    that this trust, that he set up at the time he is stealing money

10   from the federal government -- millions and millions of dollars

11   designed for PPP, designed for victims, people who were

12   suffering economic losses from the pandemic -- he sets up the

13   money -- he takes the money fraudulently.  Creates this trust in

14   Belize.  Funds the trust.  And then controls the trust to the

15   extent that he is signing documents affecting this sale of this

16   million dollar property in Texas that he takes his family to

17   live in.  And then, on the day of sentencing says, We have been

18   very transparent about the trust.  I don't understand that

19   argument at all.

20         MS. WAID:  It's one of those issues, Your Honor, where

21   the trust had not come into play for more information because we

22   were working on the assets, via the plea agreement, to fulfill

23   the restitution.

24         THE COURT:  But this financial disclosure is not just

25   about restitution.  This is an obligation, signed under oath.

1   It's something that people do in these cases.  I am troubled by

2   that.

3           And then, you know, the government's whole position

4   is, he is trying to hide assets.  He has placed assets outside

5   in this trust.  To the extent it's valid, and that's not for the

6   sentencing court to determine what happens, whether people can

7   attach those assets.

8           Again, my purpose is just to evaluate the overall

9   characteristics of this defendant and determine what is an

10  appropriate sentence.  And, certainly, these type of actions are

11  relevant to that.

12          So, I reject the idea that it was adequately

13  disclosed.  Just looking at the form right in front of me, it

14  clearly wasn't.

15          Now, maybe the government should have followed up more

16  on that.  I don't know.  But at any rate -- I didn't mean -- we

17  got a little off track, Ms. Kerwin, but you can go right ahead.

18          MS. KERWIN:  Thank you.

19          You know the last thing I wanted to address was

20  Mr. Walsh's efforts to sell the properties.

21          Again, they were the properties that were disclosed on

22  the plea agreement in the Path B to repayment.  And some of them

23  have been sold.  We have seen the Cisco property -- the Cisco,

24  Texas property; a commercial property in Dixie County, and there

25  was one of the airships.

1    So some of the other properties, I have been informed
2    by the defense, are for sale; that is the 12 Northwest 5th
3    Place; that's the business address.  As well as --
4        THE COURT:  That's the $4 million industrial park?
5        MS. KERWIN:  Yes.
6        And then, there is this Sweetheart Island, in
7    Yankeetown.  Two of the properties are not for sale at this
8    point.  And I would have liked to see them be up for sale by
9    now.
10       I have been informed by the defense that they are flip
11   houses, and they are being renovated or construction is being
12   done.
13       Now, if we are on what has been described as a "fire
14   sale" effort to sell the properties, flipping a house is not
15   that.  We would expect to have more properties liquidated by
16   now.
17       For example, what I am talking about, specifically, is
18   8657 Northeast 150th Avenue.  That's in Williston.  And,
19   541 Southeast 1st Avenue, also in Williston.
20       So, if we had seen full cooperation on the effort to
21   sell the properties, I think those properties should have been
22   up for sale by now.
23       Unless the Court has any other questions regarding the
24   trust or the Texas property, that is all I have now.
25       THE COURT:  Okay.  Thank you, Ms. Kerwin.

1          Do you dispute, Ms. Waid, that a couple of those

2   properties are not currently listed for sale?

3          MS. WAID:  We do, Your Honor.

4          We actually provided in our -- let's see -- our

5   exhibit yesterday, Exhibit Number 2, a letter that is dated

6   October 14th, 2022, that we provided to Mr. Keen, that included

7   all of the property -- Sweetheart Island, Dixie County; 12

8   Northwest 5th Place; 8657 Northeast 150th; 541 Southeast 1st

9   Avenue.  And, with that letter, we actually provided the

10  listings of all of those properties and documents to support

11  that they were actually for sale and still remain for sale.

12         And, this morning, we also have provided to the

13  government updates on where some of those properties were for

14  sale.

15         THE COURT:  So, the 12 Northwest 5th Place has been

16  for sale since October?

17         MS. WAID:  Yes.  The letter is dated October 14th,

18  2022, Your Honor, with a broker.

19         And the government has the listing agreement presented

20  in October with that letter.

21         THE COURT:  Oh, the 12 Northwest -- that's not the one

22  I meant.  That's the industrial property.  There was a smaller

23  home I thought, too.

24         The 12 Northwest 5th is the $4 million office park,

25  right?

1          MS. WAID:  Yes, Your Honor.

2          THE COURT:  Which ones were you saying were not

3     listed, Ms. Kerwin?

4          MS. KERWIN:  Pardon me, Your Honor.  I am trying to

5     find it.

6          I had referenced an email that Ms. Waid had sent not

7     too long ago.  It was definitely after the October date she

8     mentioned.  I am trying to find it.  I believe I attached it as

9     an exhibit.  That's where I learned that these were flip houses,

10    and that one of them, it was -- either the 8657 property or the

11    541 property -- was not going to be finished with it's

12    renovations until March of 2022.  That was based off an email.

13         THE COURT:  I have that.  That's Document 34-3.

14    That's an email from Ms. Waid from last week.

15         MS. KERWIN:  Thank you.

16         (Indiscernible crosstalk)

17         MS. WAID:  They were trying to get more value by

18    renovating while they were still for sale.

19         THE COURT:  You say he has been working to get the

20    property ready for sale.  But, you're saying it was already

21    ready for sale; is that what you are saying?

22         MS. WAID:  Your Honor, they could sell it as-is, or

23    they could get more value out of it by actually renovating.  So

24    it was -- as of October 15th, or 14th, Your Honor, with the

25    broker, listed for sale but they were actually working on it to

1   get more money out of it.

2           MS. KERWIN:  Your Honor, just as a follow-up to that,

3   I guess I would ask, where are the funds coming from to renovate

4   that property?  If it's going to increase the value that much, I

5   would ask: Where are the funds coming from?

6           THE COURT:  Ms. Waid?

7           MS. WAID:  I mean, Mr. Walsh does most of the work

8   himself, Your Honor.  And so, just basic business income.  He is

9   actually doing the work himself.

10          THE COURT:  There is no building materials going into

11  this?

12          MS. WAID:  No.  There are building materials,

13  Your Honor.

14          THE DEFENDANT:  So, we are still operating our

15  businesses.  That was an agreement with the government.  There

16  was no restriction on that.  So, there is limited income coming

17  in.  So, to maximize the ability to repay restitution quickly on

18  these properties we are -- we have been improving them and

19  getting them ready continually.  And the listing agreements for

20  both of those properties with the broker was supplied on

21  October 14.

22          THE COURT:  So the 8657 Northeast 150th is currently

23  listed for sale with a real estate broker?

24          THE DEFENDANT:  So, on October 15th we provided the

25  listing agreement for that property.  And we have been working

1   with the realtor to improve it, to get it ready for the maximum

2   value.

3           THE COURT:  Let me ask this again.  The 8657 Northeast

4   150th Avenue is listed for sale with a broker, or is not listed

5   for sale with a broker?

6           THE DEFENDANT:  Yes, it is.  I don't think he has

7   started marketing efforts on it yet.  That's supposed to start

8   in February.  But that's just, you know, working closely with

9   the realtor.  So, on October 15th we supplied to the Court the

10  listing agreement for that property with the broker -- to the

11  government.

12          THE COURT:  So there is a listing agreement but no

13  listing?

14          THE DEFENDANT:  It's at the realtor's discretion on

15  that.  We signed a contract with him to list the property.

16          THE COURT:  Well, I am just trying to understand --

17  and I won't ask any more questions.  You don't have to answer my

18  questions either, Mr. Walsh.  You stood up and wanted to speak,

19  and I let you, and I had a couple of follow-up questions.

20          It seems -- well, Mr. Keen, you were standing up.

21          MR. KEEN:  I don't know that I need to add anything

22  that the Court hasn't already said, Your Honor.

23          THE COURT:  Okay.

24          I guess I will ask this, Ms. Waid: This email, it sure

25  looks like, based on your email from last week, that the 150th

1    Avenue house is not currently for sale.  Maybe I am misreading

2    that.

3            It seems kind of consistent with a lot of what I view

4    as misdirection and half answers and things from the papers.

5    For what its worth, and I am not relying on Zillow, but Zillow

6    shows it as not being on the market, as I am looking at that

7    right now.

8            I am not prepared to make a finding about whether it's

9    currently for sale or not.  I don't know that that ultimately

10   matters.  What matters is whether this defendant is -- the

11   extent to which he has taken acceptance of responsibility, the

12   extent to which he is doing what he set out to do.

13           Yes, ma'am?

14           MS. WAID:  I'm sorry, Your Honor.

15           THE COURT:  You're fine.

16           MS. WAID:  Just to be clear, the October 14th email,

17   where we actually gave the listings to the government, was

18   because Mr. Walsh had entered into agreements with a broker

19   owner for sale of all of these properties.  And that person is

20   working with potential buyers to sell those properties.  That's

21   the email that we had provided to the government this morning

22   but I have a copy right here.

23           It's with a broker developer.  It has been since

24   October 14th.  And that person is the person who is actually

25   seeking the buyers for these properties.

1                    THE COURT:  All right.

2                    Okay.  Anything else on the assets or any of the

3       finance issues?

4                    MS. KERWIN:  No, Your Honor.

5                    THE COURT:  Anything from the defense on any of those

6       issues?

7                    MS. WAID:  Nothing else, Your Honor.

8                    THE COURT:  Okay.  Let me see if I had any other

9       questions.  Let me look back at my notes here.

10                    (Pause in proceedings.)

11                    THE COURT:  I do want to ask this -- this is something

12      that's new to the PSR.  It's a footnote that relates to this

13      house that we have discussed at length in Texas.  But the PSR

14      states in the new addition to the footnote, this is on page 20,

15      and it relates to paragraph 70, it says:  Defendant provided a

16      down payment of $500,000.

17                    Do you dispute that as a factual matter?

18                    It's small print there.

19                    MS. WAID:  Sorry, Your Honor.  Court's indulgence.

20      I'm trying to --

21                    THE COURT:  Sure.  Take your time.

22                    It's page 20 of Document 29.

23                    MS. WAID:  The bold?

24                    THE COURT:  Yes.

25                    MS. WAID:  Those were the -- that was the outside

1   money we have been discussing about earlier, Your Honor, from

2   the outside investors.  And then I believe there was a loan for

3   the balance.

4           THE COURT:  Okay.

5           So you do dispute that factual assertion?

6           MS. WAID:  It was from him personally.  Correct.

7           THE COURT:  So, that's an objection to that.  Is there

8   any response or evidence on that from the government?

9           MS. KERWIN:  Your Honor, no; I don't have any proof

10  that that payment came from investors.

11          THE COURT:  Okay.

12          That objection will be sustained and I won't consider

13  that aspect of the fact.

14          Okay.

15          Let's turn then to the objections.  We will start with

16  the objection -- government's objection about whether

17  2B1.1(b)(17)(A) applies.  This is the provision that applies the

18  two-level enhancement if the defendant derives more than a

19  million dollars in gross receipts from one or more financial

20  institutions.

21          It's not included in the PSR right now.  The

22  government has objected and says it ought to be.  Both sides

23  submitted legal argument on that.

24          I do want to make sure I have one clarification right;

25  the defendant is not asserting that the banks involved in the

PPP transactions were not financial institutions, as that term
applies here; correct?

MR. LAZARUS:  Your Honor, if I may?

THE COURT:  Sure.

MR. LAZARUS:  We do not dispute that some of the
fraudulent loans were obtained from financial institutions.

THE COURT:  Okay.  And a million dollars, you don't
dispute that either, correct?

MR. LAZARUS:  We don't.  But we would add, or we would
suggest, Your Honor, that there is no evidence right now for the
Court to decide which of the various institutions were financial
institutions and which were non-banks.  We don't dispute that
those facts may be there, but they are not before the Court in
the format that you currently have.

THE COURT:  I am glad I asked the question.

I understood your objection about the government is
the ultimate risk-bearer.  The government is the ultimate victim
here, which I think everyone agrees to.

I understood your objection to be just that the
financial institutions that did exist were not the sources of
the funds; that it was more akin to a wire transfer or something
like that.  That's the way I understand the objection.

MR. LAZARUS:  Thank you, Your Honor.  And if I wasn't
clear in my objection, I apologize.

What you have just stated is the primary argument that

1  we are raising.  But just along the lines of the lack of

2  foundation before the Court, there were a number of institutions

3  including NewTek, Harvest, Fountainhead -- they all call

4  themselves non-banks.

5          As the Court knows, there is a number of very

6  complicated definitions throughout the United States Code and

7  other regulations, what is and isn't a financial institution.

8  And we may very well agree on some of those.  But there is no

9  record before the Court for you to decide that now.

10          THE COURT:  I understood what you are saying about

11  NewTek, Small Business Finance Incorporated; what about Chase?

12  Do you dispute that Chase is a financial institution?

13          MR. LAZARUS:  Not at all, Your Honor.

14          THE COURT:  Okay.  Well, then doesn't that make that

15  issue moot because he got over a million dollars from Chase

16  alone?

17          MR. LAZARUS:  Your Honor, I believe that those were

18  loans that were applied for with Chase, but not funded, so those

19  would not qualify under the government's theory that disbursing

20  of loans was the harm caused to the lender, to bring that within

21  the purview of the enhancement.

22          THE COURT:  Okay.  I see what you're saying.

23          So you do dispute that Celtic Bank Corporation is a

24  financial institution for purposes of the guidelines?

25          MR. LAZARUS:  I don't know whether I dispute it or

not.  I dispute whether there is evidence before the Court right

now.  They haven't proved it, Your Honor.  It's their

enhancement.  It's their objection.

THE COURT:  Well -- okay.

Mr. Keen?

MR. KEEN:  Yes, Your Honor.  If I can have one moment

please.

THE COURT:  Sure.

(Pause in proceedings.)

MR. LAZARUS:  Your Honor, can I confer with Mr. Keen

for one moment?

THE COURT:  Sure.

MR. LAZARUS:  It may save us some time.

(Pause in proceedings.)

MR. LAZARUS:  Thank you, Your Honor.

MR. KEEN:  Your Honor, what I would proffer to the

Court -- and I will certainly present testimony, I am trying to

look in the statement of facts to see if we included which

financial institutions were federally insured.  I thought we put

it in there.

I am going to start with ECF Number 1, page 5,

paragraph 11, which is the Information; Celtic Bank, Web Bank,

Renaissance Bank, Trustmark National Bank, First Home Bank and

JP Morgan Chase Bank, I believe, are all federally insured by

the FDIC.

1          If the defense -- well, a quick Google search would

2    find that answer, but if not I have a FDIC agent that can

3    testify.

4          MR. LAZARUS:  Your Honor, it's not my job, I believe,

5    to Google things.  But I will take counsel's representations

6    that the Indictment is accurate in that respect.  He doesn't

7    need to put on a witness to that.

8          My point was simply that the record wasn't developed.

9    I am perfectly content to agree to that.

10         THE COURT:  To agree to what?

11         MR. LAZARUS:  That the institutions that he just

12    identified are, in fact, financial institutions.

13         THE COURT:  All right.

14         Does that mean, to the extent your objection was that

15    Celtic Bank and others were not financial institutions, you are

16    withdrawing that?

17         MR. LAZARUS:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MR. LAZARUS:  I am withdrawing it with respect to the

20    ones that Mr. Keen has just specifically identified.

21         THE COURT:  Which were which ones, Mr. Keen?

22         MR. KEEN:  Celtic Bank --

23         THE COURT:  Well, the Celtic Bank alone gets you over

24    a million?

25         MR. KEEN:  Right.

1          MR. LAZARUS:  That's correct.

2          THE COURT:  So, then you are left with the objection

3    that we started off with, which is that it wasn't the source of

4    the funds.  It wasn't the victim.

5          MR. LAZARUS:  Yes, Your Honor.  That's right.

6          THE COURT:  All right.  So, there is no issue about

7    the million dollars coming from Celtic, and there is no issue

8    about Celtic's status as a financial institution for purposes of

9    this guideline.

10          MR. LAZARUS:  Correct.  Your Honor.

11          THE COURT:  All right.

12          Do you have additional argument on, or do you want to

13    stand on what you have submitted in writing?

14          MR. LAZARUS:  Just very briefly, if I may, Your Honor.

15          THE COURT:  Sure.

16          MR. LAZARUS:  I will stand on what we submitted.  I

17    think we covered the issue and we talked about the *Muho* case.

18    We agree with probation's reading of that.

19          We object to --

20          THE COURT:  Well, probation's reading isn't your

21    reading.  They are saying it's a little open and they are not --

22    your reading is they are just not the source.

23          MR. LAZARUS:  They are not the source.  They are not

24    the victim.  The *Muho* case requires both.

25          THE COURT:  Right.  I am not sure that was probation's

1    ultimate conclusion.

2              At any rate, I will determine --

3              MR. LAZARUS:  It's our position, and we would ask the

4    Court to find accordingly.  I would say, Your Honor, that we

5    object to the use of the transcript that the government

6    introduced -- that they filed, I believe it was last night.

7              First of all, we ask for any *Jencks*, or other material

8    of a fact witness, if it's being used as statements here before

9    for the Court.

10             Obviously, hearsay is admissible at a sentencing

11   hearing so we are not challenging on those grounds.  But we are

12   challenging it on the grounds that it should be of no weight for

13   this Court because it deals with an entirely different case.

14             It doesn't talk about Celtic, for example, or any

15   of -- how their internal operations work.  It was a person from

16   the SBA, who was in charge of marketing, by her own words.  And

17   so, as the Court may be aware, there has been a number of

18   publications, including one by the Inspector General to the SBA

19   about how poorly all of these programs were managed, and,

20   certainly, PPP and EIDL.  And, so, it's just not reliable, we

21   submit, Your Honor, for some marketing person from the SBA to

22   opine as an expert on the flow of funds from the SBA through

23   financial institutions.

24             THE COURT:  The funds came from Celtic Bank.  You are

25   not disputing that, are you?

1      MR. LAZARUS:  We are not disputing they came from

2  Celtic Bank, but what we would say is that the government, in

3  order for this to be actual harm to the financial institution,

4  as opposed to simply being affected by it, they need to give

5  you, Your Honor, facts to show they were deprived of use of the

6  money, or they were somehow victim, is what the *Muho* case says.

7  They were paid fees.  Some of the banks were paid $15,000 fees

8  for administering these "no risk loans," from their perspective.

9      THE COURT:  That doesn't mean it wasn't their money.

10     MR. LAZARUS:  But it -- they get an application from

11 an individual.  They then submit that to the SBA.  The SBA then

12 says, here is your loan number.  So, at that point, before any

13 money has left them, they know it's guaranteed.  So, they are

14 just passing it on.

15     The *Muho* case talks about the different ways that that

16 might function.  And this is very different from the *Muho* case.

17 And so, if the bank knows, when it lets the money go out the

18 door, that it cannot be a victim, Your Honor.  So that negates

19 the findings that they are harmed and a victim.

20     The old reading of the guideline, before it was

21 amended, was broad --

22     THE COURT:  What it knows is that it can't

23 ultimately -- it knows that the federal government is standing

24 behind it.

25     The government made an analogy of an insurance policy;

1  if someone physically robs a bank with a gun and the bank is

2  insured and made whole and they know that as soon as that robber

3  leaves that -- you know, that was a traumatic event, but at

4  least we are not going to have any financial loss because we

5  have an insurance policy.  How is that different?

6        MR. LAZARUS:  So because that's money that's in the

7  bank's general depository account.  I am not an expert on the

8  inner-workings of a bank, Your Honor, but, in general, for

9  purposes of the analogy, right, that's money the bank has.  And

10  it's there for them.  They are holding it.  They have custody

11  over it.  They are going to distribute it how they want based on

12  their review of the different accounts.

13        THE COURT:  That's exactly the situation with Celtic

14  Bank; is it not?

15        MR. LAZARUS:  But this is a situation where someone

16  walks in -- they don't have to do anything other than pass on

17  paperwork.  Once they pass the paperwork on the --

18        THE COURT:  They have to have the capacity to make the

19  loan.  It's their own funds.  They can't lend the same dollars

20  to two different people.

21        MR. LAZARUS:  That is right.  It is their own funds,

22  but at the point they give it out there is zero risk that they

23  will be victimized.  Even if a bank has insurance, it's a

24  different scenario.  It's different money.  They have said to

25  the SBA, This is who we intend to lend this money to.  And the

1    SBA says, Here is your SBA number.  Guaranteed.  You have zero

2    risk.

3            And, so, were they used as part of this?  Sure.

4            Were they harmed by and victimized, which is what's

5    more of a hurdle?  No, because they got paid for the use of

6    their money.  And so, you know, the time value of money, who

7    knows.  But there is no foundation, is my point, before the

8    Court for that.

9            The witness who testified before Your Honor in that

10   other trial, that we were not party to, on cross-examination,

11   when the defense attorney asked questions of the witness, the

12   witness said -- I am quoting from page 103 of the transcript:

13           *Again, I don't process the loans so I don't know*

14   *exactly how much fraud actually happened.  Again my*

15   *responsibility for the SBA is to market the program.  So I was*

16   *out there talking to borrowers.  Letting them know the program*

17   *existed and they had the ability to apply.*

18           So the witness doesn't -- other than establishing that

19   the money physically came from the bank, which we don't dispute,

20   the testimony doesn't offer any value for the Court.

21           We will rely, otherwise, on our papers.

22           Thank you.

23           THE COURT:  Mr. Keen?

24           MR. KEEN:  I don't have anything more to add, other

25   than what I have already presented.

1          THE COURT:  Okay.

2          The government's objection is sustained as to this

3    one.  The bottom line -- just looking at the plain text of the

4    guideline, it does apply here.

5          We had the million dollars change hands.  It was from

6    a financial institution.  Those pieces are not disputed.  So

7    they were the source of the funds.

8          The fact that the federal government guaranteed the

9    loan doesn't mean that Celtic Bank was not the source of the

10   funds.  It also doesn't mean they weren't the victim.  I think

11   the analogy that the government had, which we discussed, was

12   that.

13         The fact that the government, ultimately, was made

14   whole doesn't change -- doesn't make them a non-victim.  They

15   were still defrauded.  They still issued a loan that they

16   wouldn't have without this fraud.

17         This is not like a situation where the money just

18   passes through the bank.  Some of the cases that the defense

19   cited dealt with someone stealing from an individual and bank is

20   involved.  You know, go to the back and get money out of an

21   individual's account and the bank is involved.  But it's not

22   their money.  They are just holding it.

23         Here, the bank was lending its own money -- Celtic

24   Bank was.  It was reimbursed.  And the government ultimately

25   bore the risk and the loss.  But when the funds went out that

day they went out as a consequence of the fraud.  The funds were bank funds.  They were funds owned by the bank.  So, the bank was the source.  It was the victim.

That objection is sustained and so that leaves the two-level increase.

The next objection is as to the loss amount.  The parties extensively briefed this too.  And I have reviewed the cases that both cited on this issue.

Of course it's been lurking out there for awhile and maybe we will get some firmer guidance from the Eleventh Circuit, or from the U.S. Supreme Court some day.

I think the only thing that I want to talk about today is the government's specific argument about 1B1.3, modifying the way we would look at the 2B language.  And I wanted to ask a couple of questions.

Is this going to be you, Mr. Keen?

MR. KEEN:  Yes, Your Honor.

THE COURT:  One: is there any Court that accepted that?  I looks broadly at where the language in 1B1.3, that you are relying on, is referenced in the cases.  I didn't see anything particularly helpful.  And I wanted to understand if your argument is that that creates an ambiguity with the word "loss" in the 2B guideline, or if it controls what the term "loss" means, if that question makes any sense.

MR. KEEN:  Okay, Your Honor.

1          First, I think I probably mentioned this in our

2    filings, but our position is that the best interpretation of the

3    guidelines, 2B1.1, includes intended loss and there is no

4    ambiguity.  However --

5          THE COURT:  That's not an argument that any Court has

6    accepted, right?  I mean, I know there is not a whole lot on

7    this but the weight of the authority is on their side at this

8    point.

9          MR. KEEN:  What I mean is, if you are looking 2B1.1,

10   in a vacuum, I think that argument isn't as strong.  However,

11   you can't look at 2B1.1 in a vacuum, which is why our primary

12   position is if you look at 2B1.1, in concert with 1B1.3, and

13   when you look at them together, there is no longer ambiguity

14   because 1B1.3 says all harm that was the intended -- that was

15   intended by the object of the crime -- or the next sentence --

16   the omission that was done.

17         If we didn't have 1B1.3 then I would agree that we are

18   looking just at the text of 2B1.1.

19         I don't believe that any courts has addressed the

20   argument we are making, and the position we are taking, that you

21   have to read them in concert.

22         If you just look at the text of the two there is no

23   ambiguity.

24         THE COURT:  Let me ask this:  Wouldn't that -- it's an

25   intriguing argument.  I don't think -- it's a fair argument.

1          The reason I have some pause is it seems like that

2     would be equally applicable to a number of other guidelines.

3     And it would seem to be saying that 1B1.3 makes attempt

4     applicable to every guideline when they are talking about

5     something that doesn't include attempt.

6          Just to use another example, we have how many guns are

7     involved in a felon in possession case?  Well, suppose someone

8     intended to get some others.  Does that mean that now we count

9     those?

10          Or in a child pornography case where you are counting

11     the images, do we say, well, he intended to get some others and

12     so the object of his crime included a thousand images instead of

13     the 500 he was caught with?

14          Help me understand how your reading would not do all

15     of that and alter the way the guidelines have been applied for

16     years and years and years.

17          MR. KEEN:  For other guidelines, that don't involve

18     economic harm, I don't think it's an issue because those

19     guidelines are a little more specific.

20          But, in 2B1.1 context, when we are looking at loss,

21     our position is the best reading of what loss means in the text

22     of 2B1.1 is pecuniary harm.  And pecuniary harm isn't as

23     intuitive as it would be, like, in a gun case.  So, that's why

24     when you look at 1B1.3, and you look at what they talk about in

25     terms of, quote, all harms resulted from the offense, which

1   would be actual economic harm and intended economic harm.

2   That's why we don't believe there is ambiguity -- a genuine

3   ambiguity in the text of the guidelines.

4         But to answer the Court's initial question, if the

5   Court doesn't agree with that then we would say that, in order

6   to reach 2B1.1 and 1B1.3, then there has to be -- there is an

7   ambiguity now such that you look at 1B1.3 reading, which

8   includes in harm or intended pecuniary harm.

9         I think either way we get to the same result, which is

10  you have to read them in concert.  But our facts in this case

11  tend to support that 2B1.1, on its own, implies economic harm

12  that's intended under 1B1.3.

13        THE COURT:  Okay.

14        Anything else on the loss amount issue?

15        MR. KEEN:  Well, yes.  I -- well, not other than what

16  we put in our ECF 27, our objection.  But I would note that

17  the -- and I put it in our sentencing memo -- that there exists

18  an upward departure ground.

19        If the Court ultimately rules against us on intended

20  loss I think the Court can consider that intended loss for

21  purposes of an upward departure of the guidelines and that's

22  something we would ask, if the Court is ultimately going to find

23  that you can't consider the intended loss for calculation

24  purposes.

25        THE COURT:  I will say this, generally, whether you

1   call it departure or anything else, certainly it's a valid

2   sentencing consideration, what someone's intended loss were.

3        If you had two people who had both stolen $5 million

4   and one of them had intended to steal another ten million but

5   hadn't achieved that, and they were equal in all other respects,

6   certainly one would expect the second person would face a

7   harsher sentence.  Ultimately, in this case, it may not make a

8   difference in what the ultimate sentence turns out to be.

9        Again, we are talking about a two point difference

10  here.  Some of the cases, as you all have seen, involve an

11  intended loss of $10 million and actual loss of very little, and

12  it can make a significance difference there.

13       Any response from the defense on the guidelines issue,

14  and, specifically, if someone will address Mr. Keen's argument

15  about the 1B1.3?

16       MS. WAID:  Your Honor, I think you said it best when

17  you were talking about the enhancement, that the plain language

18  of the enhancement is what we should be reading and that's

19  exactly what *Dupree* and *Banks* say.

20       And if you start applying 1B1.3 to all different

21  crimes then it's going to open up a rabbit hole of -- we are

22  completely missing the point of the sentencing guidelines, which

23  is the text is what the text is.  And there is no ambiguity in

24  the word "loss."  And I feel it's the whole thing in *Dupree* and

25  *Banks*, and that progeny, and I would argue what we argued in our

1    writing, in our memorandum, and that's what the Court said that

2    the plain language is what rules.

3            THE COURT:  Well, here is the ruling:  I'm going to

4    sustain that objection as well.

5            I think your argument, Mr. Keen, is, like I said, not

6    an unreasonable one.  I initially didn't think much of it, to be

7    honest with you, but the more I looked at these things I think

8    it's actually a close question, ultimately.  But at the end of

9    the day I am not persuaded.

10           We start with the acceptance of the recent en banc

11    case of *Dupree*, which says that *Kisor* overrules *Stinson*.  It

12    asks whether the loss, as used in the guideline, is ambiguous.

13    I don't find that it is, either with or without the 1B1.3

14    overlay.

15           I think intended loss is something different than

16    loss, and guidelines recognize that by defining actual loss and

17    intended loss differently.  So, I don't find any ambiguity there

18    and so will only consider the actual loss which is in the

19    neighborhood of 7.8 million.

20           As I said before, that doesn't mean the additional

21    intended loss, or attempted loss, can't be taken into

22    consideration.  It absolutely should be, and will be.

23           But the objection is overruled.

24           Like I said, it's a close issue and maybe we will have

25    some clarity on this at some point in the future.  But that's

the ruling there.

So, that's a two level decrease which is offset by the two level increase that we just talked about.

So, the guidelines then end up in the same place, which is a total offense level of 25 and criminal history category of I and a guidelines range of 57 to 71 months.

Any other objections anything in the PSR, Mr. Keen?

MR. KEEN:  No, Your Honor.

THE COURT:  Ms. Waid?

MS. WAID:  No, Your Honor.

THE COURT:  Okay.  So that's where we are.

With the guideline range, there will be a money judgment of the $7.8 million and change; the number reflected in the plea agreement.

There will also be restitution in that amount.

Any objection to that, Ms. Waid?

MS. WAID:  No, Your Honor.

THE COURT:  Mr. Keen?

MR. KEEN:  No, Your Honor.

THE COURT:  And then the conditions of supervised release that are set out in the PSR seem appropriate.  The one change I would note is that any unpaid restitution would be conditioned if he can make a greater payment, which I think would square with what is in the agreement, of $15,000 a quarter.

1           Any objection to doing it that way?

2           MS. WAID:  I'm sorry, Your Honor.  Could you just

3    repeat that?

4           THE COURT:  Sure.

5           The supervised release conditions that are set out in

6    the presentence investigation report deal with fairly standard

7    things like reporting his financial conditions, and things like

8    that.  One of the proposed conditions is that he pay $250 a

9    month, or something like that, toward unreimbursed restitution,

10   to the extent there is any.  And it seemed like that would be

11   too small of an amount.  I wanted to give you an opportunity to

12   weigh in on that.

13          MS. WAID:  Was the proposal 15,000 a quarter?

14          THE COURT:  A quarter.

15          MS. WAID:  That's fine, Your Honor.  Thank you.

16          MS. KERWIN:  Your Honor, in light of all the confusion

17   regarding the trust, and which assets belong to the trust, we

18   wanted to request, as a condition of supervised release, that

19   Mr. Walsh would be restricted from transferring or purchasing in

20   the name of -- any property into that trust or any other trust

21   that might be created.

22          THE COURT:  Or dissipating assets, generally, I guess

23   would be more appropriate.

24          MS. KERWIN:  Yes.  We do have -- we do have a

25   restriction on dissipating assets in the agreement.  I believe

1   it restricts Mr. Walsh was dissipating assets.  Had we possibly

2   known what we know now, we may have asked for a tighter

3   restriction on any businesses dissipating assets.  But that is

4   what we are asking for, to protect any existing assets from

5   being further dissipated into the trust and beyond the reach of

6   the government.

7         THE COURT:  The condition that's already in there

8   would be, you must not transfer or dispose of any asset, or any

9   interest in any asset, without the prior approval of the

10  supervising probation officer, unless you have satisfied all

11  financial obligations.  Obviously, that would include moving it

12  to a trust.

13        MS. KERWIN:  Unless a new LLC was created that was

14  owned by the trust, like 1402 LLC purchased the property and is

15  owned by the trust.  I think Mr. Walsh could argue that he

16  didn't do it.

17        THE COURT:  But what would that LLC be doing it with?

18  In other words, if he creates an LLC under the -- that's owned

19  by some other entity, like a trust, and then he gives money to

20  that LLC, he would be violating this condition.  Would he not?

21        MS. KERWIN:  He would be, yes.  If it was his own

22  money that was transferred in.  I think that there are

23  definitely potential problems with transferring other business

24  assets that he controls.

25        It is still our position that he controls Shiloh Oil.

1  So, if Shiloh Oil assets were transferred into another newly

2  created LLC, technically, he wouldn't have violated those

3  restrictions.

4           THE COURT:  All right.

5           (Pause in proceedings.)

6           THE COURT:  Ms. Waid, any objection to this condition:

7  You must not control any business entity or direct any

8  transactions of any business entity without probation officer

9  permission for purposes of this restriction or condition, that

10 includes business entities, it includes trusts or family trusts.

11          Any objection to doing that?

12          MS. WAID:  So, I don't have any objection to him

13 notifying probation, or anything of that nature, Your Honor.  I

14 just want to be clear that a trust, he doesn't -- he is not --

15 he doesn't control the trust or what the trust does, but we can

16 control what he does.

17          THE COURT:  Right.  So if he doesn't control the trust

18 then he wouldn't violate that.  But, I mean, there is certainly

19 some indication here that he controlled, or affected

20 transactions, including the sale of the Cisco property, the

21 purchase of his house.  I mean, this is not some blind trust

22 where someone is taking his assets and investing it for his

23 benefit and things that are unknown to him the way that some

24 presidents do, and things like that, to avoid conflicts of

25 interest.  This isn't like that.

1          MS. WAID:  Your Honor, I just wanted to make it clear.

2   To the extent his control over what his actions are, I don't

3   have an objection.

4          THE COURT:  No.  If the trust made a transaction and

5   it turned out he did not control it, he would not be in

6   violation of this, or he did not direct it.  We certainly have a

7   record here of -- he is in there making transactions in an area

8   that you are telling the Court he doesn't have authority to make

9   them.  He signed as the CEO of an entity.  He, I guess, was

10  responsible for the conversion of this entity from an LLC to a

11  corporation -- the creation and registration of another

12  corporation.  He is doing all of those things.  And then at the

13  same time saying, Well, those are beyond my control.  I don't

14  have anything to do with them.  So, that condition will be

15  added.

16         Does that satisfy what you were after?

17         MS. KERWIN:  Yes, thank you.

18         THE COURT:  All right.

19         Any objection to anything else in the PSR from either

20  side?

21         MR. KEEN:  No, Your Honor.

22         MS. WAID:  No, Your Honor.

23         THE COURT:  Very good.

24         Then what we will do -- we have been going about an

25  hour and a half here.  The usual process is that I would hear

1  anything the defense wants to make, presentation wise.  I don't

2  have if you have any witnesses to speak.  Do you have any of

3  that?

4        MS. WAID:  We do have one person who would like to

5  speak and Mr. Walsh would like to say something to the Court.

6        THE COURT:  Okay.

7        So, we do all of that, and then the government

8  responds, and then I always give the defense the last word.  So,

9  we will do it that way.

10        It might be -- we have been going about an hour and a

11  half.  Might be good to give our court reporter a break and some

12  of you may want a break.  So why don't we take a ten-minute

13  recess.  We will continue after that.

14        I will note, we have a one o'clock hearing.  That will

15  be postponed.  So if anyone is here for that, that will not

16  start until at least -- give me one moment here -- until at

17  least 1:30.

18        We will take a ten minute recess.

19      (Recess taken 11:35.)

20      (Resumed at 11:35.)

21        THE COURT:  Have a seat, please.

22        Everyone is back.  Everyone ready to begin?

23        MR. KEEN:  Yes, Your Honor.

24        MS. WAID:  Yes, Your Honor.

25        THE COURT:  Ms. Waid, I will hear from you.

1    MS. WAID:  I think Mr. Walsh would like the speak.

2    THE COURT:  Okay.

3    Will you come to the lectern here?

4    THE DEFENDANT:  Absolutely.

5    THE COURT:  Thank you.

6    If you will speak nice and slowly for our court

7 reporter, please.

8    THE DEFENDANT:  Yes, sir.

9    I brought notes because I'm definitely nervous.

10    THE COURT:  Take your time.

11    THE DEFENDANT:  So I will start off by -- thank you,

12 Your Honor, for allowing me the opportunity to share just a few

13 words here.

14    I would like to first thank the prosecution.  I feel

15 they have been very professional and fair throughout this whole

16 investigation and process.

17    So, -- sorry -- so, I grew up in a loving home with

18 parents who taught me to love and fear God.

19    As a young teenager, one example I vividly remember, a

20 time when my father was put in a position to either compromise

21 his convictions or lose his job, and without a moment's

22 hesitation he chose to lose his job.

23    Through my adult life I have been enormously blessed.

24 I have a very loving and patient wife.  We have 11 beautiful

25 children: six boys and five girls.  My oldest is ███████18.  My

1  youngest is my daughter, ███████, who we -- she is five

2  months and we affectionately call her ██████.

3          Thankfully, they all take after their mother.  They

4  are amazing kids.  Probably the worst we have it is we wake up

5  in the morning with two or three of them in our bed every night.

6          We have had our share of trials throughout life but

7  consistently, have been blessed with a loving church, loving

8  church family, and friends that have supported us throughout our

9  life.

10          I have always tried to teach my children to love God

11  and put Him first in their lives.  I have taught them that it is

12  in the moments when no one is watching or when you think your

13  current situation gives you an excuse or a pass; it's those

14  moments that really determines the measure of a man.

15          Sadly, and without excuse, when I was tested I failed,

16  and failed miserably.

17          I worked for years to build a reputation on integrity

18  and character, yet, when it really mattered, I didn't practice

19  what I spoke.

20          I recognize that there are real victims from my

21  crimes:  Number one, the U.S. government and the country that I

22  love.  I am very patriotic and passionate about America; the

23  Small Business Administration.  I recognize that there are many

24  other small businesses who couldn't get the funding in a timely

25  manner because of my actions as well.

1          Finally, my wife, Hannah, and our children.  They have

2    tried to be very tough and strong throughout this process.  This

3    has been going on for a couple of years.  But I realize the

4    depth of the raw pain that I have caused them, especially to my

5    wife, Hannah.

6          I'm sorry.

7          THE COURT:  Take your time.

8          THE DEFENDANT:  Hannah is one of the most selfless,

9    loving, patient people you will ever meet.  And the pain that I

10   have caused her is a debt that I will never be able to repay.

11         And then just you, Your Honor, whatever sentence you

12   give me today will be far less than I deserve for what I have

13   done.

14         Thank you.

15         THE COURT:  Thank you, Mr. Walsh.

16         MS. WAID:  Mr. Walsh's pastor would like to say a few

17   words, Your Honor.

18         THE COURT:  Okay.  That will be fine.

19         THE WITNESS:  Your Honor, first I want to say thank

20   you for reading the letter I wrote to you.  That means a lot to

21   me.

22         THE COURT:  Would you say your name for the record.

23         THE WITNESS:  Daniel Kendall, K-e-n-d-a-l-l.

24         I am Patrick's pastor.  Been his pastor for about four

25   years now.  I am not a lawyer.  I don't understand half of what

1    you all talked about this morning.  But I do have a very close

2    relationship with Patrick, as I do with all of my flock.

3           I just want to share a little bit about what I know of

4    him for you to take into consideration as you make your decision

5    today.

6           One of the things you heard Patrick choking up about,

7    his love for his family.

8           When you hear of someone with 11 children sometimes

9    you get a stereotype in your mind of, maybe, their view of

10    women, and those types of things.  But I can tell you, as a

11    pastor looking out on the congregation, he's got two kids in his

12    lap, he's taking the fussy ones out so his wife can sit there,

13    he is pushing them on the playground so his wife can have time

14    with her friends, he is taking his boys with him on business

15    trips.  He wants them to go with him -- as was disputed this

16    morning about being in Texas -- because he wants to be with his

17    family.

18           In my private conversations with him, the thing that I

19    think has been one of the biggest pains is to watch his wife

20    hurt and to know he is the cause of it.  And he has never

21    disputed that in any of my conversations with him.  And that's

22    probably the greatest guilt that he carries is the pain that he

23    caused his family.  To me, it takes a lot for someone to not

24    make excuses for how much they have hurt his family.

25           He is also a very generous man in terms of with his

business.  I know that all businesses are intended to turn a
profit, but throughout the time I have known him he has employed
numerous people.  More for their benefit, than for his own.

I will have give you example: There is a young man in
our congregation.  Comes from a broken home.  Really
directionless.  Had no real direction for what he was doing in
life.  Patrick hired him.  I don't think Patrick would
acknowledge this, but pretty much created a job for him that he
could do, and has continued to do so.

When the young man wanted to get married, he could not
afford to find housing, Patrick helped out with the first and
last month's rent.

With all the stuff that has been going on in the last
couple of days, he gave the young man a raise to help him take
care of his family.

That's the type of person he is.  There is a lot of
other young men who have started families that he has personally
helped by hiring them, even if that wasn't the best financial
interest of his company.

As it relates to my interactions with him, again, I
haven't been on all the interactions you have.  I don't look at
financial documents.

One of the things, and I indicated this in my letter,
is he volunteered all the information to me.  I know I am his
pastor and people confess their sins to me all the time.  But

1    that is very unusual for people to come to me before they are

2    really caught.  And I think it speaks of what he said this

3    morning.  There is the genuineness of it.  He is wrong.  He

4    knows he was wrong.  And he acknowledges he was wrong.

5            So, I thank you for the opportunity to speak and I do

6    not envy your position.  And I thank you, as a citizen, for the

7    work that you do trying to balance all of these things.

8            But that's the Patrick I know.

9            Thank you, Your Honor.

10           THE COURT:  Thank you, sir.

11           MS. WAID:  Thank you, Your Honor.

12           Just briefly, the defense would be requesting for the

13   Court to look at the 3553(a) factors, obviously, and actually

14   grant a variance in this particular case.

15           This was a pre-indictment plea.

16           Mr. Walsh has no priors.

17           He has a 11 children.  He has a loving wife.

18           And the majority of -- the majority of his life he has

19   actually dedicated to helping others.

20           I mean, this is somebody who actually was walking the

21   walk.  And he says he taught his children to do that and when it

22   was his time, he made grave mistakes and he did.  But the

23   majority, the vast majority of his life he did missionary work.

24   He volunteered.  He helped people.  He creates job.  He takes

25   care of 11 kids, which is far more and better than I could do,

believe me.

He is in his community and he cares very, very deeply about that community. And that's him as a person.

What occurred was Mr. Walsh got in over his head. He actually started these businesses because he loves aviation. That's what his joy was. That was his passion. He actually volunteered to search and rescue missions with NASA. This is what he always wanted to do with his life and he loved these companies deeply.

He got in trouble. His business skills were not the greatest and he started getting these high interest loans and those were bringing down the company. He wasn't able to provide for his family and he wasn't able to provide for his employees and he made some really stupid mistakes by fraudulently getting those PPP and EIDL loans.

He was trying to get those businesses back. Once the pandemic hit, there was no worse industry than the blimps industry. There was no going to Super Bowls or entertainment. The whole world stopped, and he panicked. And he was desperate. He made dumb choices.

But we would ask that you look at the remainder of his life, and the earlier years when he actually built this company with grit, and he actually took care of others, and he dedicated his life to helping people. We'd ask that you actually consider that when you are fashioning your plea [sic] and we'd request a

1   variance, Your Honor.

2           Thank you.

3           THE COURT:  Thank you.

4           Mr. Keen?

5           MR. KEEN:  Your Honor, before I make my argument, in

6   general, there was a part of the sentencing memo that was filed

7   by the defendants regarding the civil matter, and I would ask if

8   AUSA Marie Moyle can address the Court on that portion only

9   before I argue.

10          THE COURT:  That will be fine.  I am happy to hear it.

11          I can tell you that it does -- it's not a significant

12  factor to me that there is a civil side of things.  Obviously,

13  the law allows different types of relief in this type of

14  situation.  The argument the defense made, in a sense, was -- I

15  think they used the term "piling on."  But that this sentence

16  ought to be reduced, I think, was the ultimate request based on

17  the fact that there is a civil aspect of things.  I don't think

18  that's very persuasive argument.

19          Certainly I am happy to hear from Ms. Moyle.

20          You will, of course, get a rebuttal to all of this.

21          MS. MOYLE:  Judge, just briefly, I think we just heard

22  some of the words about Mr. Walsh and how he has accepted

23  responsibility.  But, in terms of if it goes to your

24  consideration, we have disclosed to Mr. Walsh, since

25  February 2022, the mandatory treble damages with his actions.

During that time, since then, they have not represented, to the best of our belief, the finances accurately. And, again, the False Claims Act provides for mandatory treble damages. That is not optional. And we did not receive the ability to pay forms which is the only way --

THE COURT: You did not what? I'm sorry?

MS. MOYLE: The ability to pay forms, which is the only way the Department of Justice considers less than treble damages, until December 22nd, 2022.

During the nine months, from February to December, there were multiple, you know, offers going through the ability to pay. And, as we heard here today, during that time he was transferring assets.

And it wasn't until they requested the forms first in September 2022, and then they delayed an additional three months in providing them, despite multiple representations that they were intended to be provided.

Your Honor, if there are no further questions.

THE COURT: Thank you, Ms. Moyle.

Mr. Keen?

MR. KEEN: Thank you.

I want to first start off of by -- I do commend the defendant for resolving the case early when we reached out to him through his lawyers by way of an Information. That's admirable. And as the Court knows in other cases, there are

sometimes that we do that, we resolve cases quickly and we don't

waste the Grand Jury's time.  So, for that we recognize that is

an acceptance of responsibility on the defendant's part.

What I was hoping we would come here and do, like I

told the defendant and his attorneys when we first met, was that

I was going to come in here with restitution having already been

paid in full.  And I would tell the Court, just like I did in

our case a few years ago here, that this defendant has done

everything we can expect of a federal criminal defendant.  That

was my intent.  That was my hope.  And we had that conversation.

And there has been back and forth communication since.  And here

we are at sentencing.

And, as the Court noted, there has been a lot of

discussion about this trust, and about assets, and about the

property in Texas, and the outstanding restitution that still

has not been fully paid.

So, we are not in a position to praise the defendant

that much for where we are at.

I think it's important for the Court, as you noted, to

consider a few things:  In the sentencing memo, the defense

creates the issue that the blimp industry was suffering.  He was

panicking.  He needed money.

And then it sounds like what he did was, instead of

just trying to keep his businesses afloat, he decided to take

the money and go another avenue -- the oil business and the real

estate business.  And that's not really what the PPP funds and the EIDLs were designed to do.  It was designed to keep employees paid and businesses afloat.

And I would analogize it to somebody who gets student loan money school and decides, Well, school is not really for me so I am going to buy a nice sports car with the money instead.

That money was designed for a particular purpose.  And as the defendant admits through his plea he stole it.  And he got it by fraud.

I would analogize the issue with the assets that we have been talking about at length today, and how the defendant has provided information to probation, or to the government. And the argument that's been made consistently by the defense is we told the government about it.  And I have a couple of things:

First of all, at the time that we were negotiating this case -- the plea agreement and the plea rider, those were dated and filed early August of 2022.  At that time, when we were working on that, as the Court knows from the record evidence already here, he was in the purchase of this house for over a million in Texas.

That's not something we knew about that was clearly conveyed to us.

The other thing is while he was discussing not only the criminal case, but the defense has brought the civil case into the sentencing by saying DOJ is looking to get damages on

1   the civil side.  Knowing what civil had had against him for a

2   potential false claims case, the defendant was buying assets in

3   Texas and a pretty nice house.

4        All the while, we are operating under the

5   understanding that he was worried about his family home, here in

6   Williston, which is why we made very painstaking detail to carve

7   out that home so that the family is not destitute.

8        But it turns out the family clearly isn't going to be

9   destitute.  They have a nice home and a lot of land here and,

10  apparently, there a second home with a lot of land, and a pool,

11  and a swing set over in Texas.

12       That's something that many families, who were affected

13  by the pandemic, from lost income, don't get to have.  And

14  that's what the whole purpose of this benefit program is for.

15       So, to say that he told the government about the trust

16  and he told the government about this house, he wasn't hiding it

17  in the traditional sense.  These things were hidden plain sight.

18       When you say it's a company provided home, that

19  doesn't mean what we have seen in these pictures in Texas.

20  That's not what comes to mind, at least for me.  It's

21  misleading.

22       We ask the Court to consider that as it pertains, as

23  the Court, noted these 3553(a) factors because it goes to his

24  acceptance of responsibility, not just at the beginning when he

25  pled and says, I am going to try to sell all of these assets,

but what has he done all the way through.

What I would say is in this case, and I will keep it simple, theft is theft.  What he did was wrong.  And I understand, you know -- in his memo and here in Court, someone with religious background and upbringing knows from a young age: Thou shall not steal.  And that's what he did.  Not just once.  Not just twice.  But if you look at the statement of facts that goes on and on for that many pages, there was that many false statements that he made to the government to increase the amount of money he was eligible to receive for businesses that were legitimate, but also for businesses that didn't have any legitimate income, or employees, that would have qualified for loans.

So, to say he needed money for his businesses; there was a small subset that he got that he may have qualified for, but, what he did was purely greed and he was looking out for his own interests and that of his family.  And that is evident in what we were arguing about earlier with this property and trust in Belize.

I would ask the Court to consider those things.

THE COURT:  One thing I will note, and Ms. Waid will get a chance to respond to this, there has been a lot of representation in the papers that even though it wasn't done legally, the ultimate result was to help other people, and save other jobs, and things like that.  I don't see that in these --

1　　in the documents.  I don't see evidence of that.

2　　　　　　It's unclear where all the money went, but obviously a

3　　lot of it went to his benefit and not to others.

4　　　　　　Is there evidence that this went to pay employees and

5　　thing like that?

6　　　　　　MR. KEEN:  Yes, Your Honor.  I talked to Ms. Waid

7　　about this yesterday.  I was intended to call one of our agents

8　　and get into all the money tracing.  Ultimately, I thought it

9　　wasn't as important of an issue to waste time on.

10　　　　　　My understanding, and I talked about this with

11　　Ms. Waid, there was some money that went to payroll.  Out of the

12　　eight million, my guess is between one and two million.  But

13　　there were a number of employees that were interviewed that were

14　　part of the investigation who said they never got paid, or they

15　　didn't get paid, and they had to live off credit cards and

16　　whatnot during the time that the defendant was receiving money

17　　from the SBA.

18　　　　　　The understanding that I had was that some of the

19　　lower-level employees may have gotten pay checks, but not all

20　　the employees.  Of the eight million that he got, I would say a

21　　small portion went to payroll.

22　　　　　　THE COURT:  One to two million?

23　　　　　　MR. KEEN:  One to two million, is my understanding.

24　　　　　　We laid out three-and-a-half million in the money

25　　laundering transactions that were in the statement of facts.

That's not every transaction. We just picked a representative
sample of transactions that would otherwise qualify for 1957
statute.

          THE COURT: What are those? Are those recipients that
are laid out in the PSR and the statement of facts, what are
they?

          MR. KEEN: You are talking about the money laundering
transactions?

          THE COURT: Yes.

          MR. KEEN: Some are mortgages that he had on his
personal home and other properties.

          I believe some of them may have been these high
interest loans that he was talking about.

          I think some were for the acquisition of other
properties by some of those law firms. But I believe there is a
few title companies and/or lending companies, like Supreme
Lending -- if I am not mistaken, some of those were for the
property here in town, the family residence. And my
understanding is he took some of the federal dollars to pay off
his own personal mortgages.

          But, again, I didn't get into the tracing of all of
that because at the end of the day none of that money he should
have received in the first place, even if some of it went to
employees but not all of it.

          THE COURT: The Williston ten acre homestead still has

1 a note on it?

2       MR. KEEN:  I believe so.  There are notes on that and

3 I think the surrounding two parcels of land, if I am not

4 mistaken, which is something we will have to sift through going

5 forward on the restitution collection.

6       The other thing I would ask, as a side, like I

7 mentioned earlier, the attempted loss that's not accounted for

8 by the guidelines, I don't think the Court would treat it that

9 way, but simply put he shouldn't be given a pass because it's

10 not in the guidelines.  Because that is a significant amount

11 that he tried to get that he was not successful in getting.

12       Does the Court have any other questions for me?

13       THE COURT:  I don't think I do, but let me look.

14       (Pause in proceedings.)

15       THE COURT:  No, sir.  Thank you.

16       MR. KEEN:  Thank you.

17       THE COURT:  Yes, ma'am.

18       MS. WAID:  Thank you, Your Honor.

19       Just quickly, for the record, the request, when we

20 refer to the civil, was for the fine portion of things, because

21 the treble damages would be a lot of money, even on the 7.8 --

22 we're talking over $20 million.

23       When we were talking about what Mr. Walsh, kind of,

24 spent the money on -- and I don't dispute.  We did speak about

25 it yesterday at length.  We actually met with the government

yesterday and have been as cooperative as possible.  But it's

approximately, we believe, 2.7 million was paid in employee

payroll.

I don't have the benefit of discovery, because it was

pre indictment plea so I haven't seen those 302s.  I do know

that come 2021, after -- while we were still going through the

pandemic, they actually did have to lay off employees because

the money had run out.

The majority of the transactions that occurred, that

are actually within the indictment, include kind of rent

payments for business locations, business loans were paid off.

As I described, Mr. Walsh got in over his head and had a lot of

high interest business loans that were secured by -- that was

properties.

So a lot of those -- a lot of the money went to pay

off those high interest loans.  It went to pay rent.

He did switch gears, because he was unsure if the

airship business was going to be able to bounce back, and he did

buy other properties, and things like that, under Walsh Land,

because there was another business they had.

He knows that was wrong and he should not have

utilized that money to buy those properties.  But it was in a

misguided attempt to actually change his business so that he

could, in fact, start making money and revenue again.  So those

are kind of where that went.

1          So, in the sense of, we were never trying to state

2     that what he was doing with the money was correct.  And, again,

3     completely misguided and completely wrong.  But even as we

4     discussed the Laredo, Texas property, he's working.

5          He then went into the oil business to start that.  And

6     there are actually affidavits that we sent to the government

7     from employees who were there last week on a business meeting.

8     They are actively working to make something work.  To make

9     revenue come back and to rebuild these businesses as he has done

10    several times.

11         THE COURT:  I think the last piece I am less sure

12    about.  But, generally speaking, what happens with the funds,

13    you make the point he is not buying Ferraris or taking exotic

14    vacation.  Certainly he is benefiting himself along the way.

15    But if, as the government acknowledges, you know, north of a

16    million, you say two -- north of two million was used to pay

17    employees, that's certainly a mitigating factor.  And that's not

18    one that I gave much consideration to until just now because it

19    didn't seem like there was much back that up.

20         Given the government's representations in that regard,

21    I accept that.

22         MS. WAID:  Thank you, Your Honor.

23         THE COURT:  Anything else further from either side?

24         MR. KEEN:  Want to clarify the numbers because I think

25    we are about 800 or $900,000 apart on our numbers.

1          I believe -- when I said between one and two million

2    we were basing that on payroll that appears to have been paid to

3    employees.

4          The number Ms. Waid had, I think, includes payroll

5    that went to the defendant and his wife, who, my understanding,

6    was not an employee of the company because they have 11 kids to

7    take care of.  So our numbers are different because they are

8    excluding the defendant and his wife's income, according to the

9    paycheck records.

10         THE COURT:  Okay.  Let me ask this, Mr. Keen --

11         MS. WAID:  I will go --

12         THE COURT:  Go ahead.

13         MS. WAID:  I will go with the government's number,

14   Your Honor.

15         And could we briefly approach, too?  Just briefly?

16         THE COURT:  Sure.

17     (Following conference held at sidebar at 12:02 PM.)

18         THE COURT:  Let me make sure that Ms. Snyder can hear.

19         MS. WAID:  We also wanted to let the Court know, and

20   Mr. Keen and I talked about this yesterday, that Mr. Walsh has

21   been cooperating with the government.  He has actually come in.

22   It didn't rise to the level of a 5K yet, because he provided

23   documents, and emails, and all of those things last week, so

24   they haven't been able to verify that.  It may turn into a 5K,

25   it may not.  But I wanted to let the Court know when I said

1  "cooperation," I wanted to let the Court know that.

2        THE COURT:  Thank you.

3     (Following conference held at sidebar at 12:03 PM.)

4        THE COURT:  Then, in the memorandum, the defense, your

5  position is 18 months is appropriate.

6        Mr. Keen, you talked about an upward variance.  I

7  don't know if you were requesting one, or ultimately it's the

8  government's position that the guidelines are sufficient, or

9  insufficient.

10       Tell me -- you sort of said in these circumstances a

11 variance could be appropriate, which, obviously, that's, you

12 know, a consideration in any case.  But what's the government's

13 view on the sufficiency of the guideline sentence?

14       MR. KEEN:  Well, our position would be that the

15 objection that the Court sustained, as to the intended loss,

16 would put us at another plus two, which would put us -- bump us

17 up slightly on the guidelines.  But I say to give the Court -- I

18 mean, the Court knows it could always vary.  But the departure

19 ground is there.

20       I think in this case if you just look at it, at a

21 30,000-foot view, we have a defendant who obtained $8 million

22 and tried to get 15-and-a-half million dollars, roughly, from

23 the government by fraud.

24       I don't know where the Court's head is at, as far as

25 the guidelines, and where the sentence ought to be. I know in

1    other cases we have had, we have had healthcare fraud cases

2    where the defendant received quite a significant sentence based

3    on that fraud and the money laundering.

4          We have also had a PPP and EIDL trial where that

5    defendant received an upward variance, but the large reason for

6    that was prior history.

7          THE COURT:  A consideration -- every case is different

8    as you all know.

9          MR. KEEN:  I was just pointing out the fact that the

10   Court can vary.  It can always vary.  But it can also depart

11   within the guidelines, based on the numbers.  And we are not

12   that far between the guidelines with the plus two for intended

13   loss, in this case, as opposed to in other cases where, as the

14   Court pointed out, intended loss could be ten million and actual

15   loss could be zero.

16         I would submit, given what we have heard, that perhaps

17   the upper end of the guidelines that we are operating under

18   would be a fair balance.  But I don't want to argue against

19   myself, of course, in case the Court was considering going above

20   the current guidelines.

21         THE COURT:  Do you want to respond to any of that?

22   Like I said, I give the defense the last word but, sometimes,

23   there is a back and forth.

24         Anything further?

25         MS. WAID:  No, Your Honor.

1          THE COURT:  Okay.

2          Give me just a moment.

3          (Pause in proceedings.)

4          THE COURT:  Your request for a departure was just

5    contingent based on the objection that I resolved in your favor;

6    is that right, or was it not?

7          MS. WAID:  Yes.  Actually, it would have been resolved

8    by the loss argument, Your Honor.

9          THE COURT:  Okay.

10         This is a difficult case.  A lot of sentencings are

11   difficult.  A sentencing is probably one of the more difficulty

12   things that a judge has to do.

13         This case is difficult because there is a lot of

14   aggravating factors and there is a good many mitigating factors

15   also.

16         What I am going to do is I'm going to tell you what

17   the sentence will be, then I will explain it in some detail, and

18   then I will formally impose it.

19         It is going to be a guideline sentence.  It's going to

20   be in the middle of these guidelines.  It will be 66 months as

21   to the each of the two counts; those will be concurrent,

22   followed by three years of supervised release.

23         I will tell you more about the supervised release in a

24   minute.

25         I start with the seriousness of the offense.  This is

an extraordinary serious offense.  There was nearly $8 million

stolen from the government.  That, in and of itself, of course,

is a terrible thing.

I do find an aggravating factor, I think, it was worse

because of what was the intended purpose of these funds.

I mean, from the government's perspective it's not an

ordinary bank fraud, if there is such a thing as an ordinary

bank fraud.  But it was taking advantage of a program that was

designed to give immediate and rapid assistance to people who

really needed it based on the pandemic.  And so, I do find the

nature of the program, that was the ultimate victim of this, is

an aggravating factor.

It was worse, too, in that you used the funds largely

for yourself.  I did consider the fact that somewhere in the

neighborhood of $2 million went to others, that is a factor I

considered, but much of this went to advance your own financial

interests.

There is evidence that you stowed away much of it, or

a good bit of it, for future use.  I find this whole episode

with the trust, while this was going on -- forming this foreign

entity that wasn't designed to help employees.  It was designed

to help you and people close to you, putting it in Belize, away

from creditors, I think, is an aggravating factor, too.

I do find, based on everything that's been presented

to the Court, that there is continued sort of misdirection about

1   where these assets are and where they have gone.  That's
2   consistent with the incomplete disclosures that we talked about.

3        I am going to direct the probation officer to submit
4   for filing, so it will be part of the record, the financial
5   statement that I addressed today and the attachment -- the real
6   estate attachment.  Those will be filed under seal and those
7   will be part of this record.  But those are things that I
8   reviewed.

9        So, there were incomplete disclosures.  There was sort
10  of misdirection about what's going on with all of these
11  entities.

12        That goes to the extent of the acceptance of
13  responsibility and I will talk about that a little bit more.
14  You do get credit under the guidelines, the three-level
15  reduction, based on the acceptance of responsibility.  I am not
16  taking that away.  I think there would be a basis to do that,
17  but I am not doing that in this case.

18        I always do look at the extent of the acceptance of
19  responsibility, and what people do leading up to the sentencing
20  factors in to that.

21        So, we have somebody who, again, at the time that the
22  fraud was going on is setting up this foreign trust, putting
23  proceeds of it, or funds, assets, in a foreign trust away from
24  the creditors, and then it's set up in a way that will be for
25  your long-term benefit.

1          Then we have the more recent activities:  Buying this

2    house last summer.  There is an argument it's not his house;

3    it's the trust house.  It's clear that he was controlling the

4    transactions.  I don't think there is any dispute about that.

5          We have the documents where he is signing as CEO of

6    the trust, managing member of the LLC.  He says that was a

7    mistake.  I don't know how someone mistakenly asserts in a

8    transaction like that that they are the managing member of a LLC

9    that they don't control.  So, I do find there is still a lack of

10   acceptance of responsibility in that regard.

11          Then on top of that, there is the fact that these

12   funds ultimately went to you to buy this luxury home.  There is

13   discussion, Well, the company needed it.  This was a huge

14   benefit to him personally.  I don't think there is any disputing

15   that.  The company, to the extent it needed housing for

16   employees, could have done something different.

17          And then we have this series of transactions to get

18   there involving his asserting control of these entities that, on

19   the one hand, are there for his benefit, when they can benefit

20   him, but then when it comes to, you know, paying the victims,

21   they are not there.  They are beyond the reach.  So, I found

22   that to be a consideration but not as significant as some of the

23   other ones.

24          I do always look to the need to deter criminal

25   activity.  I look at the need for general deterrence.  There is

1   too much fraud out there, particularly in this PPP area.

2          The government pointed out in its memorandum, and we

3   have seen these cases before where, particularly, in white

4   collar crimes like this, there is a greater need to deter

5   because those are the types of people that are more rational

6   when it comes to making risk/reward analysis.  So, I think with

7   a general deterrence there needs to be a substantial punishment.

8          I think a rational person -- if I impose the sentence

9   the defense has requested of 18 months, I think a rational

10  person might look at that and make a different risk reward

11  analysis than in the interest of society.  Someone could say, I

12  am willing to do 18 months in prison if I take $7 million of

13  government money, stow it away in a foreign trust, and go to

14  prison for 18 months.  So, I do think something less than what I

15  am about to impose would be insufficient for general deterrence.

16         I also find it's necessary for specific deterrence as

17  to this defendant for many of the same reasons.

18         The biggest aggravating factor here is the size of the

19  loss: Nearly $8 million in actual loss.  I did sustain the

20  objection as to including the intended loss, but that's very

21  much a factor.  That was another nearly $7 million of intended

22  loss that does exacerbate the crime here.

23         We also have the volume of the transactions.  This is

24  not, you know, a single moment of weakness.  It's been described

25  as a moment of weakness but it's not a single transaction.

There were many, many transactions.  Different financial

institutions involved.  Different loan applications.  Different

types of loan applications.  I think that's an aggravating

factor as well.

Also, the fact that he involved his wife's name, at

least in terms of applying for loans in her name -- and every

indication is it was without her knowledge, that's an identity

theft issue.  But it's also just a really concerning factor that

someone would involve his wife and potentially implicate her in

something like that.  So, that's an aggravating factor as well.

So, like I said, there are a lot of aggravating

factors. I think in many instances facts like these could lead

to an upward variance of an above guideline sentence.  In this

instance I am not going to because of the mitigation.

Again, we talked about the acceptance of

responsibility.  I find there is some here.  Not the same amount

that maybe there could have been, or there are in other cases.

I very much considered the family situation.  It's

obviously something that was mentioned in the papers, and I

certainly understand and appreciate the difficulties that it

places on a large family with lots of young children when the

head of the family is sent to prison.  And that's something I

took into consideration.  But it also wouldn't be fair to other

people who don't have large families to, sort of, get much of a

credit for that that absolves them of their criminal liability.

1    But I did consider the family situation.

2           It is unfortunate that in many instances families

3    suffer for things that they didn't do.  That will be the

4    situation here and that in unfortunate, but, ultimately, it's

5    the consequence of the decision that this defendant made.

6           I did consider the fact that there was an indictment

7    waiver.  That is certainly some mitigation.  Not a tremendous

8    amount, but it's something that I considered.

9           I considered the facts about what we talked about at

10   the sidebar just now.

11          I also considered the letters and what the pastor said

12   today.  I do find that there is a lot of good works that

13   Mr. Walsh has done in the community and other places.  And I do

14   find he has been helpful to other people.

15          And, again, as I mentioned, some of this money -- a

16   substantial dollar figure, somewhere in the neighborhood of

17   $2 million went to others.  And so, that's consistent with the

18   overall idea that he is helpful to others at, and I do accept

19   that, and I have considered it.

20          But given the seriousness of the offense, given the

21   need to provide specific and general deterrence, I do find --

22   and the need to provide adequate punishment -- I find that a

23   lesser sentence would be inadequate.

24          And I will note for the record that, based on those

25   considerations, I would make the same finding, even had I leaned

the other way, on the two-level enhancement regarding the
financial institutions.

This sentence is the exact sentence I would have
imposed had I sided with the defense on the financial
institution two-level issue because it's my judgment that
anything less than this would be insufficient to afford
sufficient deterrence, general deterrence, adequate punishment,
and to reflect the seriousness of the crime.

There will be supervised release for a term of three
years to follow.  That will be on each of the two counts.  Those
will be concurrent.  It will be the standard conditions, the
mandatory conditions, and the specific conditions that are set
out in the presentence investigation report.

That will also be -- the modified amount of unpaid
restitution due will be $15,000 a quarter, instead of what is in
the PSR, which, I believe, is $250 a month.  So, it will be
$15,000 a quarter toward the unpaid restitution.

And there will be an additional condition that will
say this:  You must not control any business entity, or direct
any transactions of any business entity, without the approval of
the probation officer.  For purposes of this condition, that
business entity includes any trusts and family trusts.

So that will be part of that.

On the mitigation, I should also note that I do find
the defendant remorseful.  I do find he genuinely regrets his

conduct.  And I considered that factor as well.

There will be -- no fine will be imposed, but there will be a $100 special monetary assessment as to the each of the two counts so that will be $200.

Ms. McCommon, did I cover everything?

Oh, actually, I did not.  The restitution -- I mentioned this earlier, but I will note it now and I will impose it in a moment.

The restitution will be the $7.8 million and change.  It's $7,818,167.  That will be due immediately.  And then there will be a forfeiture money judgment of the same amount entered as part of this sentence as well.

The restitution will be directed to the Small Business Administration.  Is that correct, Mr. Keen?

MR. KEEN:  Yes, Your Honor.

THE COURT:  That will paid to the Small Business Administration.

I will impose the sentence now, unless there is anything we need to address before I do that.

We will talk about releasing things after the sentence is imposed.  Mr. Keen?

MR. KEEN:  No objection.

THE COURT:  I am asking is there anything else we need to address before the sentence is imposed?

MS. WAID:  Well, Your Honor, we would be asking for

1  Pensacola, if possible.

2          THE COURT:  I will include a recommendation that you

3  be housed near Pensacola.  Mr. Walsh, that's ultimately up the

4  Bureau of Prisons.  They make those decisions.  But I will

5  include that recommendation.

6          If you will stand now I will impose the sentence.

7          Sir, you have been adjudicated guilty of the two

8  counts set out in the Information.

9          I do find that the presentence investigation report is

10  accurate and the findings in it are incorporated into this

11  sentence.

12          I will note that there will be -- I noted the

13  objections on the two issues that we discussed and then, also, I

14  did not consider the footnote that your counsel objected to

15  about the $500,000 going to the house.  That was not considered.

16          Pursuant to the Sentencing Reform Act of 1984 and all

17  amendments, it is the judgment of the Court that you be

18  committed to the custody of the Bureau of Prisons to be

19  imprisoned for a term of 66 months.

20          That's as to each of the two counts, but those will be

21  concurrent, so it will be 66 months total.

22          This does address the seriousness of the offense and

23  all the characteristics of this defendant.

24          It's my judgment that this is sufficient, but not

25  greater than necessary, to comply with the statutorily defined

purposes of sentencing.

I have considered all of the 3553(a) factors in fashioning the sentence. I have talked about some of them. I have considered all of them.

There will be no fine but there will be a $100 special assessment pursuant to 18 USC 3013 for each count, for a total of $200.

Restitution is ordered in the amount of $7,817,167, payable to the Small Business Administration. That is due immediately.

Forfeiture money judgment will issue in the same amount.

Upon release, you will be placed on a term of supervised release for three years. That's three years on each count but those will be concurrent.

While on supervised release, you will be required to comply with the standard and mandatory conditions, as well as the specific conditions set out in the presentence investigation report, with the two changes -- with the one change and the one addition that I mentioned a moment ago. Those will be the conditions.

The total sentence is 66 months' imprisonment. Three years on supervised release, $200 special monitary assessment, and forfeiture and restitution.

As I noted a moment ago, the sentence is the same as

1   it would have been regardless of how the objections came out on

2   the guidelines objections.

3         You all can have a seat.

4         I am going to say a couple of other things and then I

5   will solicit objections.  One, I did consider everything that

6   was said today.  I considered everything in all the filings on

7   both sides.  Some of those were very helpful as I approached

8   this.

9         One thing I didn't talk about, that I did consider, is

10   the need to avoid unwarranted disparities.  And I went through

11   and looked, based on the cases that you submitted, Ms. Waid.  I

12   am familiar, generally, with a lot of other case in this area.

13   There was one just yesterday.  The Department of Justice had a

14   press release dated Friday, actually; 45 months for someone

15   who -- where the restitution was only 1.6 million.

16         Some of yours had different -- what you submitted had

17   different loss amounts.  And, of course, every case is

18   different.  But I did consider those cases that you submitted.

19   I considered a number of other cases, too.  And I did take into

20   account the need to avoid unwarranted disparities.

21         Are there any objections to the sentence of the manner

22   in which it was imposed, Ms. Waid?

23         MS. WAID:  No, Your Honor.

24         THE COURT:  Mr. Keen?

25         MR. KEEN:  No, Your Honor.

1       THE COURT:  Okay.

2       Like I said, there will be a recommendation for

3  Pensacola.

4       Mr. Walsh, you do have the right to appeal this

5  sentence.  Any appeal would have to be filed within 14 days of

6  the written judgment.  So today I pronounced the sentence

7  orally.  It will be confirmed in a written judgment.  That

8  begins the 14-day clock.

9       If you can't afford a lawyer for the appeal, one would

10  be appointed for you.  If you can't afford to pay the cost of

11  the appeal, you can apply to proceed without cost.

12       You should talk to your lawyers about whether you do

13  or do not wish to appeal.

14       I want to make sure you understand the 14-day

15  deadline.  Do you understand that?

16       THE DEFENDANT:  Yes, sir.

17       THE COURT:  Your lawyers can file a notice of appeal

18  for you or the clerk of court, if requested, will file a notice.

19       There has been a request that he be permitted to

20  self-report.  I understand probation does not have an issue with

21  that.  Is that correct?

22       PROBATION OFFICER:  That is correct, Judge.

23       THE COURT:  Mr. Keen, what's the government view on

24  that?

25       MR. KEEN:  This isn't one of those cases where it's a

1  mandatory remand and I don't believe there has been any

2  violation of the conditions, so we leave it in the Court's

3  discretion.

4           THE COURT:  How much time is appropriate in your view,

5  Ms. Waid?

6           MS. WAID:  Your Honor, we would ask for 90 to 120

7  days.  The reason being, one, he has 11 children to figure out

8  what's going on there.  And, two, he has done 1.6 million in

9  restitution, but there are additional properties being sold,

10 hopefully within the next 120 days, that it would just be easier

11 if he was there and be able to get the money back to the SBA.

12          THE COURT:  So these are deals that are in progress?

13          MS. WAID:  They are in progress at the moment,

14 Your Honor.  We are also trying to work out with DOD, if we

15 possibly can, a sale of the blimps, which would make it easier

16 and quicker.  We just need Mr. Walsh for that.

17          THE COURT:  Mr. Keen, what's your view on 90 days?

18 That's far greater than probably is typical, but that's your

19 view?

20          MR. KEEN:  I told the defense I would leave it to the

21 Court's discretion.

22          If the issue is needing Mr. Walsh's signature on some

23 documents, I think that could be accomplished in a number of

24 different ways through his lawyer's POA, something like that,

25 but...

1          THE COURT:  You are leaving it to the discretion.

2          MR. KEEN:  I really don't want to take a position,

3    like I told them I wouldn't.

4          THE COURT:  All right.

5          Then the government takes no position.

6          Here is what I am going to do, I'm going to put it at

7    60 days.  We will find a precise date here in a minute.

8          If there are concrete reasons why that needs to be

9    extended, you can file a motion and we will deal with that then.

10         I will say this, and it relates to the sentence I just

11   imposed -- I talked about misdirection and things like that --

12   some of that was exemplified in some of the presentation today.

13   We talked about the house; was it for sale, was it not?  Where

14   is the money coming from?  Well, he is doing the work.  Well,

15   aren't there supplies?  Well, yes; there are supplies but the

16   company is paying for those.  And he is in Texas but he is here

17   doing work on this rental home.

18         So, I'm not certain what will happen in these next 60

19   days.  I have a hard time accepting that there are deals right

20   there ready to be closed.  But, having said that, I am going to

21   grant 60 days.  And if there is, like I said, a concrete reason

22   why it needs to be extended, you can file a motion.  But it

23   would need to be something other than, we have this in the

24   hopper or we are working on this, things like that.

25         So we will do roughly 60 days.  I will look at the

1    calendar here.

2        April 3rd is a Monday.  It's a little over -- 62 days.

3    Mondays are good.  We will set it for noon on Monday, April 3rd.

4        Here is the way this works, Mr. Walsh: I am obligated

5    to remind you that if you fail to turn yourself in on time,

6    that's not only a violation of the current terms of your

7    release, but it's also a separate federal offense that could

8    lead to a new prosecution completely independent of all this.

9        You will leave here today on the same conditions that

10   you came in on.  You will need to comply with those conditions

11   while you are out.

12       And you absolutely must turn yourself in on time.

13   This is not something where someone can afford to say, my car

14   broke down or anything like that.  It's a must.

15       So noon on April 3rd.

16       You can turn yourself in here at the United States

17   Courthouse to the marshals when you first come in.  If a

18   facility is designated by then, and I expect it will be, you can

19   alternatively turn yourself in there.

20       If you take that option you will be responsible for

21   your own transportation cost.  So, again, the Bureau of Prisons

22   decides where you will be.  If you are in, say, Texas, you can

23   take yourself there to that facility at your own expense, or you

24   can turn yourself in here and they will transport you.

25       Do you understand that?

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  All right.  That's that.

3        I will say this, in closing, these cases are

4    difficult.  They are all difficult.  This one perhaps

5    particularly so because there is a lot of aggravation, a lot of

6    mitigation, as I talked about.

7        This is -- in the grand scheme of things many

8    sentences are much longer than this that are imposed.  At your

9    age, you will be able to come out and get on a different track

10   and perhaps have a great redemption story.

11       I have seen cases go in two different directions; one

12   is people learn from their mistakes and don't return to them and

13   have great success on the back end.  Other times people go the

14   opposite direction and wind up back here.

15       Obviously, the supervised release serves a purpose of

16   making sure that you are doing what you are supposed to be

17   doing.  But it is my hope that you will take the first path and

18   not be back here again.  You certainly have the ability to do

19   it.  You have a lot of support in the community.  And there is

20   no reason why you shouldn't be able to get this behind you and

21   lead a productive and successful life after this.  I hope that's

22   the outcome.

23       Anything else from the government?

24       MR. KEEN:  No, Your Honor.

25       THE COURT:  Anything else from the defense?

1          MS. WAID:  No, Your Honor.

2          THE COURT:  We will be in recess until 1:45, when we

3     will begin what was going to be the one o'clock hearing.

4        (Proceedings concluded at 12:29 PM on Thursday, February

5     02, 2023.)

6                        *  *  *  *  *  *  *  *

7          I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
8     Any redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
9     transcript.

10    /s/ Lisa C. Snyder                    2/7/2023

11    Lisa C. Snyder, RPR, CRR                   Date
      Official U.S Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25